Alfred Lubin, Appellant, v. Equitable Life Assurance Society of United States, Appellee.

Gen. No. 42,933.

Heard in the second division of this court for the first district at the December term, 1943. Opinion filed June 15, 1945. Released for publication June 27, 1945.

DAVID H. CAPLOW, SOL ANDREWS and MAURICE L. DAVIS, all of Chicago, for appellant.

MAYER, MEYER, AUSTRIAN & PLATT, of Chicago, for appellee; MILES G. SEELEY, of Chicago, of counsel.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

By this appeal plaintiff, Alfred Lubin, seeks to reverse a final order dismissing this action for want of equity, which order was entered on the motion of defendant, Equitable Life Assurance Society of the United States.

Nineteen separate plaintiffs, including the plaintiff herein, filed nineteen separate suits in equity against

nineteen mutual life insurance companies, each plaintiff, a former policyholder, claiming to represent in each suit all other former policyholders who were similarly situated in respect to the defendant company in that suit and praying for an accounting and distribution to such former policyholders of their proportionate shares of that portion of undistributed surplus funds held by the respective companies, which were accumulated during the time the plaintiffs' policies were in force.

A motion to dismiss, under sections 45 and 48 of the Civil Practice Act (pars. 169 and 172, ch. 110, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 104.045, 104.048]), was filed by the defendant in each of the nineteen cases. Each motion attacked the respective complaints on several grounds. In all of the nineteen cases the motions to dismiss were sustained and, each plaintiff electing to stand on his complaint and to suffer judgment of dismissal, a final order was entered in each case which dismissed the action for want of equity. Separate appeals, which were perfected in the nineteen cases, have been consolidated for hearing in this court.

The allegations of the complaints in the nineteen cases are essentially the same and each of them averred substantially that the defendant is a mutual life insurance company organized in a State other than Illinois; that plaintiff is a former policyholder and member of the defendant insurance company and that after the policy was issued to him by said defendant the premiums were paid as long as his policy remained in force; that a surplus fund was accumulated by the defendant in excess of the legal reserve and the fund set apart each year for the payment of dividends and that this surplus belongs in equity to all of the members who contributed to the same in proportion to their respective contributions during the time they were members of the defendant company; and that by the

payment of premiums on his policy, plaintiff contributed to this fund which now amounts to several million dollars.

It was further alleged that other policyholders paid premiums on their policies until they either lapsed, were cancelled or were surrendered and that by so doing they likewise contributed to the surplus fund; that plaintiff brings this suit for himself and others in like situation; and that this fund is held by the defendant in trust for him and all other former policyholders he purports to represent. The complaint concluded with a prayer for an accounting, appointment of a receiver and the distribution of the surplus fund according to the interests of the parties therein.

The theory of the complaint of the plaintiff herein, as well as that of the plaintiffs in the other eighteen cases, as stated in their brief is as follows:

"In mutual insurance companies, the assets of the company, including the surplus, are held by the company for the benefit of all of the members. The members are entitled to participate in the surplus accruing during the terms of their membership, in proportion to their contributions to such surplus, through the payment of premiums. This right is not lost when a policy lapses or is surrendered or matures; for the issuance of a policy of insurance creates the status of membership, and the right to participate in the surplus, flowing from such status, does not end with the expiration of the insurance coverage provided for in the policy. A right to distribution of the interest of any policyholder, in the entire undistributed surplus accruing during the period in which the policy remained in force, arises immediately upon the lapse or surrender or maturity of the policy."

We deem it appropriate at this point to explain just what the "surplus" is which the plaintiffs seek to have distributed to them in proportion to their contributions thereto, through their payment of premiums

while they were members of the defendant companies and their policies were in force. The statutes of the state in which each of the defendants is domiciled require that a reserve equal to the present value on a net premium basis of all outstanding policies must be set aside and maintained. Such reserve is generally called the "legal reserve." The legal reserve is not a surplus but is considered a liability. Surplus is the excess of assets each year over the legal reserve and other liabilities, which consist principally of losses and expenses of operation. Such surplus is usually referred to as the "total surplus" of an insurance company. That portion of the total surplus determined by each company's board of directors to be available for dividends is called the "divisible surplus." Only what remains of the total surplus in any year after the divisible surplus has been determined and set apart for the payment of dividends constitutes what will be variously referred to hereinafter as the "contingency reserve" or "safety fund." The contingency reserve or safety fund as determined at the end of each year is added to the contingency reserve or safety fund previously accumulated since the inception of each of the defendant companies. Such contingency reserve funds were created and are maintained by the defendants as an additional factor of safety for the protection of their policyholders against extraordinary hazards, such as major epidemics, wars and financial crises or panics. It is to compel the payment to them and other former policyholders of what they claim to be their proportionate shares of each of the defendant company's contingency reserve or safety fund that plaintiffs have instituted these suits.

All but four of the nineteen defendant companies are expressly authorized by statute in the States where they were incorporated and are domiciled to create and maintain a contingency reserve or safety fund. As to two of the four defendant companies which are not so

specifically authorized by the statutes of the States of their domicile, it was clearly contemplated by the statutes of those States that mutual life insurance companies might create and maintain contingency reserve or safety funds. As to the other two of said four defendant companies the statutes of the States of their domicile (Connecticut and Vermont) contain no provision with respect to the creation and maintenance of contingency reserve or safety funds but neither do the statutes of those States contain any provision that could be construed as prohibiting a mutual life insurance company from accumulating a contingency reserve or safety-fund. In Iowa, where one of the defendant companies is domiciled, there is no specific statutory provision authorizing the accumulation of a contingency reserve or safety fund but the Supreme Court of that State in three cases—*Wall v. Bankers Life Co. of Des Moines,* 208 Iowa 1053, 223 N. W. 257; *Central Life Assur. Soc. v. City of Des Moines,* 212 Iowa 1254, 238 N. W. 535; *New York Life Ins. Co. v. Burbank,* 209 Iowa 199, 216 N. W. 742—expressly approved and commended the maintenance of contingency reserve or safety funds by mutual life insurance companies doing business in that State and held that former policyholders have no interest in such funds; that the amount thereof is a matter confided to the discretion of the board of directors of the particular insurance company; and that by analogy to the insurance statutes of New York a contingency reserve or safety fund not exceeding a company's legal reserve is reasonable.

Several of the grounds alleged in the motions to dismiss filed in this and many of the other consolidated cases are not common to all of the cases but there are three grounds uniformly specified in each of the nineteen motions to dismiss. The substance of these three grounds, as stated in a brief filed in behalf of several of the defendants, is: "(1) Plaintiffs have no rights or

claims against defendants other than as are set forth in their policies of insurance. Each policy provides for the manner in which and the extent to which plaintiffs were entitled to participate in the earnings of the defendant companies during the period that their policies were in force, and likewise specifies what each policyholder would be entitled to receive in the event of the lapse or surrender of the policy. None of the complaints alleges that the plaintiffs did not receive such benefits and rights as were provided in their policies of insurance. (2) The determination of the amount and the apportionment of surplus earnings to policyholders is a matter for the exercise of sound business discretion on the part of defendants' boards of directors, acting under controlling statutes and decisions which expressly authorize them to set aside and maintain out of earnings a corporate surplus, contingency reserve or safety fund. None of the complaints alleges that the Board of Directors of any of the companies at any time during the continuation of plaintiffs' policies failed properly to determine the amount and apportionment of divisible surplus or in any way acted in fraud or by mistake. (3) An Illinois equity court does not have or, in the alternative, ought not to take equity jurisdiction to determine the plaintiffs' proportionate share, if any, in the corporate surpluses, contingency reserves or safety funds accumulated during the years the plaintiffs were policyholders and to decree payment thereof to plaintiffs. Such inquiry would require the court to exercise visitorial powers and to interfere directly with the internal affairs and management of foreign corporations. Hence, none of the complaints alleged a cause of action of which an Illinois court could or should take equity jurisdiction.''

Defendants insist that ''policyholders in a mutual company are insured under contracts, and their rights are governed by such contracts''; and that ''such rights do not include any ownership of the corporate

property or right to a distribution thereof except pursuant to such contracts." Plaintiffs' complaints do not allege that they are entitled by virtue of their policy contracts to anything in addition to what they have already received thereunder but they rely wholly upon an alleged equitable property right in the contingency reserve or safety funds of the defendant companies, claimed to arise solely from the fact that in a mutual insurance company policyholders are members of the corporation.

■ That the rights and interests of policyholders in the assets of a mutual life insurance company are contractual in nature and are measured by their policies and by the statutes, charter and by-laws, if any, which comprise the terms of their contracts was definitely determined in *Andrews v. Equitable Life Assur. Soc. of United States,* 124 F. (2d) 788, (C. C. A. 7, 1941, cert. denied, 316 U. S. 682). In that case there was a consolidation upon appeal of fifteen suits identical with those involved in the present appeal. Some of the plaintiffs were the same persons, most of the defendant companies were the same and the theory of recovery asserted was exactly the same. The appeal in the *Andrews* case was disposed of by the circuit court of appeals on jurisdictional grounds but in order to arrive at such a disposition that court was compelled to determine the nature and source of the plaintiffs' rights. There it was held at pp. 789 and 790:

"In our opinion, the rights of the plaintiff and the persons he purports to represent all stem from their policies in the defendant company. . . . The policy provides that it and the application attached thereto constitute the whole contract between the parties. *Whatever rights a member of a mutual company has are delineated by the terms of the contract, and come from it alone.* . . . The plaintiff says he does not depend for his rights upon the policy . . . . *If the plaintiff depends upon anything but his rights*

*under the contract contained in the policy, he depends upon something· that does not exist."* (Italics ours.)

(To the same effect are *Equitable Life Assur. Soc. v. Brown,* 213 U. S. 25; *Greeff. v. Equitable Life Assur. Soc.,* 160 N. Y. 19, 54 N. E. 712; *Grobe v. Erie County Mut. Ins. Co.,* 169 N. Y. 613, 62 N. E. 1096; *Polk v. Mutual Reserve Fund Life Ass'n,* 137 Fed. 273.)

██ The principles plaintiffs rely upon in their brief are applicable, if at all, only to mutual life insurance companies which are engaged in business on the assessment plan and not to legal reserve mutual life insurance companies doing business ·on a fixed premium basis. Plaintiffs' position that, although they are not entitled to the relief they seek on their policy contracts, they are entitled to such relief on the ground that they were members of the defendant mutual life insurance companies while their pol-· icies were in force is wholly untenable.

In *Huber v. Martin,* 127 Wis. 412, 105 N. W. 1031, in holding that even upon the dissolution of a mutual insurance company its surplus of assets over liabilities belongs only to those who were its members at that time, the court said at pp. 1039-1040 of the last mentioned report:

"Every policyholder knows, or ought to know, that he will remain a member so long as he remains a policyholder and no longer. He knows, or ought to know, that as soon as his membership relation is established he becomes possessed of an equitable interest in the assets of the company consisting of all accumulations prior to his time, and such as may be ·added thereto during his membership, but which cannot be realized on in possession in the absence of a necessary distribution of the surplus on account of the company going out of business, or in some proper way. He knows, or ought to know, that it is entirely optional with him whether to preserve his interest in the com-

pany and thereby protect his contingent rights, or to allow them to lapse by ceasing to be a member. He also knows, or ought to know, that in case of his interest so lapsing it will inure to the benefit of those associated with him who chose to retain their memberships and those who come after him, the doors of the company swinging freely to let in new members and to let old ones out according to choice, those at any moment of time being then and then only the owners of the company to all intents and purposes the same as members of any other corporation.''

While plaintiffs alleged in their complaints that their interests and the interests of the other former policyholders in the contingency reserve funds are held by the defendant companies ''as a constructive trust for their use and benefit,'' they do not advert to the constructive trust theory in their brief but seem to claim that a mutual life insurance company partakes of the nature of a partnership. Under this fallacious theory they argue in effect that the policyholders in the defendant companies occupy the position of partners or quasi partners and that immediately upon the lapse or surrender of their policies they became entitled to an accounting and to a distribution (return to themselves) of all they had paid in premiums during the time their policies were in force, in excess of the actual cost of their insurance coverage. If it were true that the policyholder members of mutual life insurance companies should be considered as partners, then a dissolution of the defendant companies would occur every time one of their policyholders died, permitted his policy to lapse or surrendered it for its cash value and a new partnership would necessarily come into being not only every day in the year but almost every hour of each day, since policyholders die, permit their policies to lapse or surrender them numerous times every day. The mere statement of plaintiffs' partnership theory stamps it as preposterous.

It has been uniformly and repeatedly held that a mutual life insurance company does not partake of the nature of a partnership, that its policy contracts create the relationship solely of debtor and creditor between it and its policyholders and that neither present nor former policyholders have any right to compel a distribution of such a company's contingency reserve or safety fund upon the alleged theory of a dissolved partnership. In *Cohen v. New York Mut. Life Ins. Co.*, 50 N. Y. 610, the court said at pp. 623 and 624:

"It was also claimed that the defendant being a mutual company, of which all holders of policies were members, it was a partnership which was dissolved by the war.

"Trading and commercial partnerships, and perhaps all partnerships, are dissolved by war between the States of the several partners. But whatever analogies there may be between mutual companies and ordinary partnerships, and the relation of the members of the two organizations, an incorporated company, although organized upon the mutual principle, is in no proper or legal sense a partnership. The defendant is a body politic and corporate, capable of contracting and of suing, and being sued, and the relation between the plaintiff and the corporation is that of insured and insurer; and the rights and duties of the contracting parties are to be governed and determined by the terms of the policy by which the insurance is effected, as in other cases. Other and incidental rights are secured to the plaintiff as a member of the company, one of the corporators; but this does not make the members partners as between themselves or affect the express contract of the corporation."

In *People v. Security Life Ins. & Annuity Co.*, 78 N. Y. 114, it was said by the court at p. 122:

"But the claim is made on the part of some of the appellants that the holders of unmatured policies are

not creditors, but partners in the company; . . .
The argument that they are to be treated as partners
is quite ingenious, but, I think, clearly unsound . . .
But they who pay their money for insurance are no
more jointly interested, or in any sense partners, than
the depositors in a bank. . . . The fund produced
by the payment of all the premiums does not in any
sense belong to the policyholders, but belongs exclu-
sively to the company; and the policyholders are in-
terested in it in the same way only that the creditors of
any other corporation are interested in its funds.''

In *Uhlman v. New York Life Ins. Co.*, 109 N. Y. 421,
a policyholder sued to obtain an accounting of the
company's profits and surplus. In holding that the
plaintiff was not entitled to an accounting, as he had
made no proof of any misappropriation or wrong-
doing, the court said at p. 429:

''It has been held that the holder of a policy of in-
surance, even in a mutual company, was in no sense
a partner of the corporation which issued the policy,
and that the relation between the policyholder and the
company was one of contract, measured by the terms
of the policy.''

The law is settled that policyholder members of a
mutual life insurance company are not partners therein
and that the relationship of such a company to its
policyholders is not that of trustee and *cestui que trust*
but simply that of debtor and creditor. (*Thomas v.
New York & G. L. R. Co.*, 139 N. Y. 163; *Grobe v. Erie
County Mut. Ins. Co.*, 169 N. Y. 613; *McCormack v.
Security Mut. Life Ins. Co.*, 220 N. Y. 447; *Crossman
Co. v. Rauch*, 263 N. Y. 264; *Equitable Life Assur.
Soc. v. Brown*, 213 U. S. 25; *Rhine v. New York Life
Ins. Co.*, 248 App. Div. 120; *Mutual Benefit Life Ins.
Co. v. Hillyard*, 37 N. J. Law 444.)

■ Defendants insist that ''the determination of
the amount and the apportionment of surplus earnings
to policyholders is a matter for the exercise of sound

business discretion on the part of defendants' boards of directors, acting under controlling statutes and decisions which expressly authorize them to set aside and maintain out of earnings a corporate surplus, contingency reserve or safety fund." Since none of the complaints alleged that the boards of directors of the defendant companies at any time while plaintiffs' policies were in force failed to properly determine the amount and the apportionment of the divisible surplus or that such boards of directors acted unlawfully, wrongfully or by mistake in making such determination or in determining the amount of the contingency reserve or safety fund necessary to be maintained to protect the interests of existing or future policyholders, the insufficiency of the complaints in this regard alone constituted adequate ground for their dismissal.

In *Equitable Life Assur. Soc. v. Brown*, 213 U. S. 25, the plaintiff sought to compel a distribution of the defendant's corporate surplus or contingency reserve fund, which was eighty million dollars in excess of its required legal reserves and the maintenance of which was alleged to be unlawful and unnecessary for the prudent management of its business. The court said at p. 47:

"We also think that there is no ground for the contention on the part of the complainant that he, as a policyholder, had any right to an accounting, and to compel the distribution of the surplus fund in other manner or at any other time, or in any other amounts than that provided for in the contract of insurance. By that contract he was entitled to participate in the distribution of some part of the surplus, according to the principles and methods that might be adopted from time to time by the defendant for such distribution, which principles and methods were ratified and accepted by and for every person who should have or claim any interest under the policy. It has been held that under such a policy how much of the surplus shall

be distributed to the policyholder and how much shall. be held for the security of the defendant and its members is to be decided by the officers and management of the defendant in the exercise of their discretion to distribute, having in mind the present and future business, and, in the absence of any allegations of wrongdoing or mistake by them, their determination must be treated as proper, and their apportionment of the surplus is to be regarded prima facie as equitable.''

Defendants contend that the trial court should have declined to take jurisdiction of these nineteen cases because the plaintiffs' alleged rights are dependent upon matters involving the internal management of the defendant companies. There can be no question but that plaintiffs' alleged rights depend upon matters involving the internal management of the defendant insurance companies, all of which are foreign corporations, and that the enforcement of such rights would require the exercise of visitorial powers. The rule is firmly established that no court, state or federal, will assume jurisdiction to interfere with or control the management of the internal affairs of a foreign corporation. In *Rogers v. Guaranty Trust Co. of New York,* 288 U. S. 123, 89 A. L. R. 720, the court held at pp. 130 and 131 of the first mentioned report:

''It has long been settled doctrine that a court—state or federal—sitting in one State will as a general rule decline to interfere with or control by injunction or otherwise the management of the internal affairs of a corporation organized under the laws of another State but will leave controversies as to such matters to the courts of the State of the domicile. (Citing many cases, including *Babcock v. Farwell,* 245 Ill. 14, 33, et seq.) While the district court had jurisdiction to adjudge the rights of the parties, it does not follow that it was bound to exert that power. *Canada Malting Co. v. Paterson Steamships,* 285 U. S. 413, 422, and au-

thorities cited. It was free in the exercise of a sound discretion to decline to pass upon the merits of the controversy and to relegate plaintiff to an appropriate forum. (Citing cases.) Obviously no definite rule of general application can be formulated by which it may be determined under what circumstances a court will assume jurisdiction of stockholders' suits relating to the conduct of internal affairs of foreign corporations. But it safely may be said that jurisdiction will be declined whenever considerations of convenience, efficiency and justice point to the courts of the State of the domicile as appropriate tribunals for the determination of the particular case.''

In *Babcock v. Farwell,* 245 Ill. 14, the court said at pp. 33 and 34:

''The general rule has been declared by the decisions of many courts and has been stated by text writers to be that the courts of one State will not exercise the power of deciding controversies relating merely to the internal management of the affairs of a corporation organized under the laws of another State or of determining rights dependent upon such management. . . . The reasons which influence courts of chancery to refuse to interfere in the management of the internal affairs of a foreign corporation are, that the rights arising between a corporation and its members out of such management depend upon the laws of the State under which the corporation is organized; that the courts of that State afford the most appropriate forum for adjudication upon the relation between the stockholders and the corporation, and that frequently such courts alone possess power adequate to the enforcement of all decrees that justice may require. It is the inability of the court to do complete justice by its decree, and not its incompetency to decide the question involved, that determines the exercise of its power. The general statement that courts will not interfere with the management of the internal affairs of foreign

corporations must be construed in connection with the particular facts. The rule rests more on grounds of policy and expediency than on jurisdictional grounds; more on want of power to enforce a decree than on jurisdiction to make it. Where the wrongs complained of are merely against the sovereignty by which the corporation was created or the law of its existence, or are such as require for their redress the exercise of the visitorial powers of the sovereign, or where full jurisdiction of the corporation and of its stockholders is necessary to such redress, the courts will decline jurisdiction. Examples of such cases are suits to dissolve a corporation; to appoint a receiver; to determine the validity of its organization or which of two rival organizations is legal; to restrain it from declaring a dividend or compel it to make one; to restrain an issue of stock or of bonds; to compel a division of its assets; to restore a stockholder to his right to vote at stockholders' meetings from which he has been excluded, or to compel the recognition of one claiming to have been elected a director.''

In *Clark v. Mutual Reserve Fund Life Ass'n*, 14 App. D. C. 154, 43 L. R. A. 390, it was said at pp. 179 and 180 of the first mentioned report:

''This prayer, like the preceding, requires a complete overhauling and scrutiny of the entire administration of the internal affairs of the corporation, from the time that the plaintiff became a member down to the present time; and nothing short of a full and complete account would enable the court to decree in accordance with the prayer.

''It is thus apparent from the statement of the facts alleged in the bill, and from the several prayers based thereon, that the relief sought, if it could be granted, would require the control, direction, and revision of the internal affairs of the corporation, by a court of equity of this District. This we think, upon the clearest authority, cannot be done. The law would seem

to be too well settled to admit of a question, that where the acts complained affect the plaintiff in his rights of corporator, or stockholder, or as a member of a mutual benefit or insurance company or other corporation, and the acts are those of the corporation, done and performed in the course of the administration of the corporate affairs, and especially when claimed to have been done and performed, or authorized to be done, by virtue of authority derived from its charter or by-laws, the courts of another State or jurisdiction will not interfere or attempt to exercise jurisdiction to direct, control, or revise corporate action. To assume jurisdiction over the affairs of a foreign corporation, would inevitably lead to conflicting decisions, resulting in confusion and needless litigation, and the making of orders and decrees simply to be contemned, because not capable of being enforced.''

In *Hamilton v. United Laundries Corp.*, 111 N. J. Eq. 78, 161 Atl. 347, the court said at pp. 80 and 81 of the first mentioned report:

''This court is unauthorized to regulate, or attempt to regulate the management of the internal affairs of a foreign corporation, through the medium of an injunction. *Jackson v. Hooper*, 76 N. J. Eq. 592, 75 A. 568, 27 L. R. A. (N. S.) 658. In *Gregory v. New York, Lake Erie & Western Railroad Company*, 40 N. J. Eq. 38, 44, Chancellor Runyon said: 'It is almost too obvious for remark that this court cannot regulate the internal affairs of foreign corporations, nor can it enforce its decrees out of this state.' In *North State Copper, etc. Co. v. Field*, 64 Md. 151, 20 A. 1039, 1040, the court says: 'Where the act complained of affects the complainant solely in his capacity as a member of the corporation, whether it be as stockholder, director, president, or other officer, and is the act of the corporation, whether acting in stockholders' meeting, or through its agents, the board of directors, then such action is the management of the internal affairs of the

corporation,. and, in case of a foreign corporation, our courts will not take jurisdiction. The courts of this state do not possess such jurisdiction, and any suggestion of its assumption we emphatically repudiate.' "

To the same effect are *Massachusetts v. Missouri,* 308 U. S. 1; *Eberhard v. Northwestern Mut. Life Ins. Co.,* 210 Fed. 520, aff'd 241 Fed. 353 (C. C. A. 6); *Ellis v. Mutual Life Ins. Co. of New York,* 237 Ala. 492, 187 So. 434.

The defendant companies were incorporated and have their domiciles in the District of Columbia and nine States other than Illinois. An accounting of the magnitude requested in plaintiffs' complaints, if allowed, would require the defendants to remove a considerable portion of their records and a large number of their employees from their home offices to this State. This would place an intolerable burden upon the defendant companies and would not only interrupt the operation of their businesses but would practically disrupt their operation. Even if it could be assumed that plaintiffs' complaints did state a cause of action, considerations of convenience, efficiency and justice point to the courts of the States of domicile of the defendants as appropriate forums for the determination of the claims presented by such complaints.

. All of the contentions made in plaintiffs' brief add up to the single contention that they, as former policyholders and members of mutual life insurance companies, and all other former policyholders similarly situated, whom they claim to represent, have the right to have distributed to them by the defendant companies such portion of their "contingency reserve" funds as they contributed thereto while their policies were in force. In so far as we have been able to ascertain, this contention has been rejected by every court of review in every jurisdiction in this country to which it has been presented. Upon analysis, the decisions of courts of review cited in plaintiffs' brief either sup-

port defendants' position and holds contrary to the theory of plaintiffs' complaints or may be readily distinguished from the situation presented here.

In view of the fact that the law governing every aspect and phase of the theory of plaintiffs' complaints had been long and well established prior to the filing of said complaints, we are constrained to believe that the nineteen suits involved herein were instituted solely for what possible nuisance value they might prove to have.

Other additional grounds have been urged by many of the defendants in their motions for dismissal but in view of our conclusions upon the points that we have considered, we deem it entirely unnecessary to pass upon the additional grounds urged.

For the reasons stated herein the final order of the circuit court of Cook county dismissing the case of *Alfred Lubin v. Equitable Life Assur. Soc. of United States* for want of equity is affirmed.

*Affirmed.*

FRIEND and SCANLAN, JJ., concur.