Ethel BOLDEN, et al., Plaintiffs,

v.

**BLUE CROSS AND BLUE SHIELD
ASSOCIATION, et al., Defendants.**

Civ. A. No. 85–2658.

United States District Court,
District of Columbia.

Oct. 28, 1986.

John Ellsworth Stein, Stein, Sills & Brodsky, Michael D. Hausfeld, Cohen, Milstein & Hausfeld P.C., Washington, D.C., for plaintiffs.

Philip S. Neal, Washington, D.C., for Blue Cross & Blue Shield Ass'n.

Robert C. Chestnut, U.S. Dept. of Justice, Washington, D.C., for defendant Horner.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiffs, representatives of two classes of present or former enrollees in the Blue Cross and Blue Shield Association's Government-wide Service Benefit Plan, seek to compel their inclusion in a $784 million refund by Blue Cross and Blue Shield Association. As presently structured, the refund will embrace only the federal government and those individuals enrolled in the Service Benefit Plan as of May 1, 1985. Plaintiffs claim that the refund should benefit 1983 and 1984 enrollees, whose allegedly "excessive" premium payments built the surplus now propelling the refund. Before the court are the parties' cross-motions for summary judgment.

## I. Background

### A. Statutory Framework

In 1959 Congress established a subsidized health insurance program for federal workers and annuitants, or retired federal

workers. Federal Employees Health Benefits Act (FEHBA), Pub.L. No. 99–251, 100 Stat. 14 (1986), *codified in* 5 U.S.C. § 8901, *et seq.* The FEHBA provides for optional employee enrollment in one of approximately three-hundred competing health benefits plans. The FEHB Program covers approximately nine million federal and postal service employees and annuitants, and their dependents. In 1985 it generated $6 billion in premium income.

Each year there is a four-week enrollment period, called "open season," during which employees may switch from one health benefits plan to another. 5 U.S.C. § 8905(e); 5 C.F.R. § 890.301(d) (1986). Once enrolled in a particular plan, the employee pays only a portion of the fixed premium. The government contributes an amount equal to 60% of an average subscription charge but no more than 75% of the actual subscription charge for an enrolled individual. 5 U.S.C. § 8906(b). The rest of the premium is withheld from the enrollee's paycheck or annuity. 5 U.S.C. § 8906(d).

The statute vests the Office of Personnel Management (OPM) with broad authority to administer the FEHB Program. Pursuant to its contracting authority, OPM annually renegotiates with each carrier the rates and benefits for the next contract year. 5 U.S.C. § 8902. The FEHBA requires that rates "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). In determining the proper rates, OPM considers both prior experience and insurance industry practice. *Id.* Once set, rates remain in effect throughout the contract term. *Id.*

Premium payments by the Government and the enrollees are deposited into the Employees Health Benefits Fund. 5 U.S.C. § 8909(a). The Fund is used for three purposes. First, a percentage, not to exceed 1%, of contributions is set aside to pay OPM's administrative expenses. § 8909(b)(1). Second, for each health benefits plan, a percentage, not to exceed 3%, of contributions is set aside in the "Contingency Reserve" maintained by OPM for the particular carrier. § 8909(b)(2). The FEH-BA allows OPM to use the Contingency Reserves to defray increases in future rates, to reduce the contributions of enrollees and the Government, or to increase the benefits of the plan from which the reserves are derived. § 8909(b). Third, the remaining monies, the basic enrollment charges, are paid biweekly into the carrier's own "Special Reserve," from which the carrier then pays the medical claims submitted by the enrollees. 5 C.F.R. § 890.201(a)(8). If enrollees' claims exceed the premium charges in effect for a contract year, the Special Reserve suffers a deficit. If charges exceed claims, it enjoys a surplus. The balance in the Special Reserve is carried over from year to year and is a factor in determining the following year's rates.

### B. *Factual Background*

Since 1960, defendant Blue Cross and Blue Shield Association (BCBSA) has contracted with OPM to provide health insurance to federal employees and annuitants under the Government-wide Service Benefit Plan. There are now three million enrollees in the Service Benefit Plan, the largest of the FEHB plans. The Plan offers two choices of coverage—high option and standard option—and two types of coverage within each option—single and family.

In the early 1980's, the major FEHB carriers all suffered severe shortfalls in their Special Reserves. By the end of 1981, BCBSA's Special Reserve had a $150 million deficit. To remedy this threatening situation, OPM took several steps, including cost containment and cost-sharing measures, benefit reductions and premium increases.

The turn-around was dramatic. BCBSA's Special Reserve posted a $13 million surplus by the end of 1982. The surplus grew to $392 million in 1983 and $740 million in 1984. In May 1985, BCBSA projected that its Special Reserve would equal $957 million by the end of 1985.

On May 20, 1985, BCBSA announced its intention to refund $754 million from its Special Reserve to the Government and to employees and annuitants enrolled as of

May 1, 1985. BCBSA attributed the spectacular growth in its Special Reserve to unexpectedly low utilization of health care resources by its enrollees. The amount of an individual's refund from the reserve would be determined per capita on an option-by-option basis and would range from $18 for a Postal Service employee with single standard option to $374 for a federal employee or annuitant with family high option. BCBSA later added $30 million to its refund proposal to benefit high option subscribers.

The day after BCBSA announced the refund, OPM scheduled a public hearing to explore BCBSA's proposal.[1] At the hearing, held May 30, 1985, a number of witnesses testified both for and against the refund. The issue of the May 1, 1985 eligibility date was raised by both the witnesses and OPM. *See* Administrative Record (R. ____) at 67–68, 75–76, 97–99, 119, 130–31, 133–34.

On June 14, 1985 OPM asked the Department of Justice for an opinion on the legality of BCBSA's proposal. On July 9, 1985 the Justice Department issued a Memorandum approving the refund proposal. The Justice Department concluded that the excess funds in the Special Reserves could properly be transferred to the Contingency Reserve and then used to reduce employees' contributions either through suspension in paycheck withholding or through a one-time refund check. R. 393–411. The Justice Department saw "no reason" why a refund of employee "contributions" would not include "current contributions." R. 405. However, it advised that the FEHBA as then written would not permit the refund to annuitants, since the reductions provision of 5 U.S.C. § 8909(b) referred only to "employees." R. 405. The Justice Department recommended legislation to correct this technical flaw. R. 405, 411.

On July 16, 1985, OPM announced that President Reagan had decided to accept "the essential elements" of the BCBSA proposal. R. 413. This announcement mentioned no reasons for the decision. At the same time, OPM offered other FEHB plans projecting excess special reserves the opportunity to propose similar refunds. *Id.* OPM instructed these plans to reduce their combined Contingency and Special Reserves to a level equal to no more than two months of premium income by the end of 1986. R. 447. The plans were given the choice of refunds, rate reductions, or a combination of the two. R. 445. OPM also amended its regulations to implement the reserve reductions. 51 Fed.Reg. 7428, 7430 (1986) (amending 5 C.F.R. § 890.503(c)(5)). Ten carriers chose to follow BCBSA in giving a refund. R. 511. Others negotiated substantial premium reductions for 1986. *See, e.g.,* R. 449, 512–17. In September 1985 OPM announced the 1985 rate reductions and 1986 premium rates for each carrier. R. 512–68.

As promised, OPM submitted to Congress a proposal to amend the FEHBA so that the refund could include annuitants. R. 414–17. OPM indicated to Congress that the planned BCBSA refund would benefit only "current" subscribers. R. 414–15, 441, 502. Congress then passed a bill that included a provision substituting the word "enrollees" for "employees" in 5 U.S.C. § 8909(b). H.R. 3384, 99th Cong., 1st Sess., § 2(d) (1985). In December 1985, however, President Reagan vetoed the bill for reasons unrelated to the annuitant provision. Congress tried again, this time omitting the matter the President had found objectionable. On February 27, 1986, the amendment to § 8909(b) was signed into law. H.R. 4061, 99th Cong., 1st Sess. (1986), Pub.L. No. 99–251, § 101, 100 Stat. 14 (1986).

In the meantime, OPM had been negotiating with BCBSA to resolve the details of the $784 million refund. In March 1986, OPM and BCBSA reached agreement on the final contract amendments. R. 681. On March 31, 1986, OPM issued a Decisional Memorandum setting out the reasons for having accepted the BCBSA refund propos-

---

**1.** The public announcement of a hearing was made on May 22, 1985 and it stated that the purpose of the hearing was "to obtain views concerning alternatives for the disposition of reserves held in the FEHB program." Administrative Record at 22.

al and specifically the May 1, 1985 eligibility date. R. 2–3.

### C. *Procedural History*

On August 20, 1985, five federal employees filed a class action against BCBSA. Plaintiffs claimed to represent two classes of present or former BCBSA enrollees: (1) federal employees enrolled in a BCBSA plan in 1983 or 1984 but no longer enrolled as of May 1, 1985 (Employee Class) and (2) federal employees enrolled in the BCBSA high option or family plan in 1983 or 1984 but enrolled in the BCBSA low option or single enrollment plan as of May 1, 1985 (Reduced Benefits Class). Plaintiffs alleged that BCBSA had charged them "impermissibly increased and excessive premiums" in 1983 and 1984. Complaint ¶ 31. Plaintiffs further alleged that by using a May 1, 1985 eligibility date, the proposed BCBSA refund would deprive members of the Employee Class "of their entitlement to restitution from the restitutionary fund they had helped to build by virtue of their payment of excessive premiums in 1983 and 1984 as third party beneficiaries to the FEHB Blue Cross/Blue Shield contracts." Complaint ¶ 41. Similarly, plaintiffs alleged that members of the Reduced Benefits Class would not receive their full proportionate share of the "restitutionary fund" since the plans in which they were enrolled as of May 1, 1985 offered a lower rebate than the plans which they had left, and on which they had paid premiums. Complaint ¶ 42. Plaintiffs sought declaratory and injunctive relief to ensure their inclusion in the refund.

On November 15, 1985, we granted BCBSA's motion to compel joinder of OPM. Plaintiffs subsequently amended their complaint to name Constance Horner, Director of OPM, as a defendant.

In order to permit the refund to proceed while this lawsuit was pending, the parties signed a stipulation setting aside $25 million of the $784 million. This amount was determined to be the amount plaintiffs could recover if they succeeded on the merits of their claims. The parties agreed that if plaintiffs were denied relief, the money

set aside would revert to the OPM Contingency Reserve. Plaintiffs promised not to seek to enjoin a refund of the remaining $759 million to other enrollees and the Government. The parties also stipulated to certification of the two classes. We approved the stipulation on March 12, 1986.

On April 1, 1986, the Government filed the Administrative Record. Thereafter the parties all moved for summary judgment.

### II. *Discussion*

Plaintiffs' joinder of Constance Horner shifts the focus of this litigation from BCBSA to OPM. In their Amended Complaint, plaintiffs style this case as a restitutionary action, and they cite the general federal question provision, 28 U.S.C. § 1331, the FEHBA, 5 U.S.C. § 8901, *et seq.;* the Declaratory Judgment Act, 28 U.S.C. § 2201; and this court's inherent equitable powers as the basis of jurisdiction. Plaintiffs' present motion reveals a somewhat different theory of the case. Plaintiffs seek to vacate the May 1, 1985 eligibility date on the ground that OPM's adoption of this date was arbitrary, capricious and otherwise not in accordance with law. Plaintiffs thus now appear to view this litigation as a challenge to agency action under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*

Plaintiffs' revised approach makes sense. Without acceptance and implementation by OPM, the BCBSA plan to refund could not proceed and could not harm plaintiffs. Although BCBSA proposed the May 1, 1985 eligibility date, OPM accepted it and thus bears immediate responsibility. Accordingly, we will focus primarily on the validity of OPM's action.

Before we analyze the merits of plaintiffs' claims, we define the parameters of our review. First, we must identify the standard of review by which to judge the validity of the disputed eligibility criterion. Next, we determine the basis of our review. Specifically, it is necessary to decide whether or not to review OPM's decision on the basis of the reasons set out in the agency's March 31, 1986 Decisional Memorandum. The substantive discussion will follow.

## A. *Standard of Review*

█ The parties all agree that the standard of review guiding disposition of this case is that set out in 5 U.S.C. § 706(2)(A). We are required to set aside OPM's decision to adopt BCBSA's proposed eligibility date of May 1, 1985 if we find that action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

This standard of review is a narrow one. We must presume the agency action is valid, *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981); *Ethyl Corp. v. E.P.A.,* 541 F.2d 1, 34 (en banc) (D.C.Cir.1976), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), and we must uphold the decision if a rational basis for it is presented, even if we might otherwise disagree. *Environmental Defense Fund v. Costle,* 657 F.2d at 283.

Our review is particularly limited where, as here, the challenge involves the agency's construction of the statute it is empowered to administer. *Chemical Manufacturers Association v. N.R.D.C.,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *Red Lion Broadcasting Co., Inc. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed. 2d 371 (1969). As we discuss in more detail later, OPM's acceptance of the May 1, 1985 eligibility date reflects its interpretation of the reductions provision of 5 U.S.C. § 8909(b) as applying to "current" contributions of enrollees. Since Congress has not expressly addressed this issue,[2] our task is simply to determine whether OPM has reached a "permissible" construction of the statute. *See Chevron, U.S.A., Inc. v. N.R.D.C.,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *see also*

*Office of Consumers' Counsel, Ohio v. F.E.R.C.,* 783 F.2d 206, 218 (D.C.Cir.1986) (agency's construction adequate if it falls within the permissible *range* of interpretations).

## B. *Basis of Review*

Much of the parties' dispute hinges on whether we should consider OPM's March 31, 1986 Decisional Memorandum as the basis of our review. It is well-settled that the grounds on which agency action must be judged are those which the record discloses at the time the decision was made. *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 270, 80 S.Ct. 1122, 1127, 4 L.Ed.2d 1208 (1960); *S.E.C. v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). In the present case, OPM did not divulge the exact reasons for adopting a May 1, 1985 eligibility date when it announced on July 16, 1985 that the President had accepted the "essential elements" of the BCBSA proposal. It was not until March 31, 1986 —eight and a half months later and well after commencement of this litigation— that OPM published its reasons in the Decisional Memorandum. Plaintiffs characterize this Memorandum as mere *post hoc* rationalization and urge us to ignore it. Defendants, on the other hand, now justify the Decisional Memorandum as an explanation of reasons considered earlier and thus simply a supplement to an inadequate administrative record.[3]

█ Despite plaintiffs' contentions, the Memorandum does not represent an impermissible *post hoc* rationalization. Of course, it is the general rule that an agency may not rely on *post hoc* reasoning, divulged for the first time in litigation, as basis of its decision. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156,

---

2. *But see* our discussion below of Congress' implicit endorsement of OPM's interpretation.

3. In court OPM suggested that the agency had not taken final action until the Decisional Memorandum was published. This argument apparently reflects the ripeness defense raised in OPM's Answer. OPM's present focus on the Decisional Memorandum as merely an explanation of a decision earlier reached and, in fact, its claim that the decision was "made" in 1985,

R. 3, suggests that OPM has abandoned this ripeness argument. In any event, we do not need to determine when OPM took final action. This date is relevant only for the purpose of deciding whether the Decisional Memorandum issued on March 31, 1986 properly serves as the basis of our review. Even assuming that OPM had taken final agency action by July 16, 1986, as plaintiffs contend, we find the Memorandum is a legitimate basis of review.

168–69, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); *accord Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). But where the bare administrative record does not fully disclose the factors the agency considered, it is proper to require the agency to provide a more adequate explanation of its reasons, even though litigation has commenced. *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825; *Doraiswamy v. Secretary of Labor,* 555 F.2d 832, 842 (D.C. Cir.1976). In fact, the District of Columbia Circuit has previously ordered the agency to submit a decision memorandum under similar circumstances in a case involving BSBSA, OPM and OPM's administration of the FEHB program. *See Doe v. Devine,* 703 F.2d 1319, 1329 (D.C.Cir.1983).

The March 31, 1986 Decisional Memorandum merely illuminates reasons obscured but implicit in the administrative record. The Decisional Memorandum sets forth five reasons for excluding past enrollees, such as plaintiffs, from the refund: (1) consistency with the forward-looking nature of the FEHB Program, (2) consistency with the language and purpose of the statute, (3) avoidance of any suggestion of an "equitable interest" in the reserves, (4) consistency with general insurance practice, and (5) administrative convenience. R. 3. We note that these first three reasons all express a general conclusion that only a refund to current enrollees would satisfy the statutory plan for managing the FEHB reserves. The administrative record indicates that before July 16, 1985, OPM had indeed considered the issues of obedience to the statutory scheme, R. 405, insurance industry practices, R. 131, and administrative burden. R. 99, 402. What the pre-decisional record suggests, the post-decisional Memorandum merely confirms.[4]

### C.  *Validity of Agency Action*

As we turn to the merits of plaintiffs' claims, we emphasize what is *not* at issue

in this case. First, we do not decide whether in fact BCBSA charged "excessive" premiums in 1983 and 1984. Plaintiffs challenge only their exclusion from the BCBSA refund, not the amount of premiums they have already paid. Second, the case does not turn on whether the refund may include former enrollees. The sole issue presented is whether the refund *must* include former enrollees—and whether OPM's failure to require their inclusion was arbitrary, capricious, or otherwise not in accordance with law.

We will first review OPM's decision to allow the refund to benefit only "current" enrollees, rather than past enrollees, such as plaintiffs. We have already mentioned the five reasons set out in the Decisional Memorandum as the basis of OPM's decision. For the purpose of this opinion, our discussion will combine the treatment of the first two reasons and analyze OPM's decision as supported by the reasons it has stated: (a) consistency with the statutory language, purpose and "forwardlooking" nature of the FEHBA, (b) avoidance of recognition of an equitable interest in the FEHB reserves, (c) consistency with general insurance practice, and (d) avoidance of administrative difficulties. Since the decision to refund to "current" enrollees does not explain the use of a 1986 refund to benefit 1985 enrollees, we will next consider OPM's reasons for adhering to the May 1, 1985 eligibility date in 1986. Finally, we will turn to the issue whether even if the May 1, 1985 eligibility date is sustainable on the basis of the reasons presented by OPM, plaintiffs' equitable claims nonetheless compel plaintiffs' inclusion in the refund.

### III.  *Merits*

### A.  *Consistency With the Statute*

█ Both sides claim their proposed distribution of the BCBSA refund is consist-

---

**4.** The March 31, 1986 Memorandum also outlines OPM's justifications for ultimately permitting payment to 1985 enrollees in 1986. R. 3. This incongruity was not evident in July 1985, when, according to plaintiffs, OPM formally adopted the May 1, 1985 eligibility date. Thus,

we do not expect OPM to demonstrate in the pre-July record evidence that it relied on the reasons it later offered for adhering to a 1985 eligibility date, despite the fact that the mailing of the refund checks was delayed to 1986.

ent with the language of the governing statute. Since the statute is susceptible of the interpretations asserted by each side, both sides are right. The applicable provision in the FEHBA, 5 U.S.C. § 8909(b), authorizes three uses for surplus contingency reserves: (1) to defray increases in future rates, (2) to reduce "the contributions of enrollees and the Government," and (3) to increase benefits. The BCBSA refund represents the second option, reduction in contributions.

The statute itself does not indicate whether the term "contributions of enrollees" is meant to include past as well as current contributions. Following the traditional practice of looking to common usage to interpret statutory terms, *see Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108–09, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), we find that the definition of "enrollee" as "a person who is enrolled," Webster's New World Dictionary (2d coll. ed. 1972), implies that "contributions of enrollees" refers to present premium payments. But this implication hardly evinces Congressional mandate. The Department of Justice, which reviewed the BCBSA proposal, concluded only that there was no reason why reduction in contributions would not "include" current contributions. R. 405. It would not be a distortion of the language of § 8909(b) to read "contributions of enrollees" as also including the past contributions of individuals no longer enrolled or whose enrollment status has changed. Thus, the statute on its face corroborates both sides' positions.

The legislative context, however, is not ambiguous but supports use of the May 1, 1985 eligibility date. Congress established FEHB reserves to pay premiums, to pay administrative expenses, and "to provide an adequate reserve to assure stability of subscription rates over a reasonable period." S.Rep. No. 468, 86th Cong., 1st Sess. 17–18 (1959). More specifically, the reserves were designed "to defray anticipated increases in *future* premiums." H.Rep. No.

957, 86th Cong., 1st Sess. 13 (1959), *reprinted in* 1959 U.S.Code Cong. & Ad. News 2913, 2925 (emphasis supplied). Following this expression of intent, OPM considers each plan's special reserve in setting the following year's rates. 41 C.F.R. § 16–4.152–1(b)(2). Thus management of the FEHB reserves is an essential part of the ongoing administration of the FEHB Program and reflects what the Decisional Memorandum terms the "forward looking" nature of the Program.

This link between the reserves and management of the program for the future does not itself rule out a refund to past subscribers. The statute authorizes reduction in current contributions and, as we have discussed, there is nothing in the text of § 8909(b) to show that Congress did not intend a refund to former enrollees. Yet while § 8909(b) on its face does not bar relief to plaintiffs, OPM's emphasis on "current" contributions is more consistent with the forward-looking tone of the statutory scheme. Each one of the proper uses for contingency reserves are future-oriented: (1) to affect increases in *future* rates, (2) to *reduce* contributions and (3) *increase* benefits. Each of these action has effects *in futuro*.

More importantly, Congress has implicitly approved OPM's interpretation of the statute. In 1986 Congress amended the FEHBA to permit the refund to annuitants as well as employees. At the time, Congress was well aware of OPM's position that the BCBSA surplus reserve would be used to reduce "current" contributions. OPM had mentioned this eligibility requirement in letters to the Speaker of the House and President of the Senate, R. 414, 415, and to the Chairman of the Committee on the Post Office and Civil Service, R. 441, 588. Moreover, the legislative history of the annuitant legislation reflects Congress' awareness of OPM's distribution plan. The relevant subcommittee report recognized that the refund would benefit only those enrolled "as of a specific date." H.Rep. No. 262, 99th Cong., 1st Sess. 3 (1985).[5]

---

**5.** This report accompanied the original bill, vetoed by the President, not the bill that was

actually passed. However, there was no report issued for this second bill, which was identical

Similarly, the floor manager, Senator Stevens, recognized that only "currently enrolled subscribers" could share in the refund. 132 Cong.Rec.S. 1725 (daily ed. February 27, 1986).

Congress' clear failure to express any disagreement with OPM's interpretation of "contributions of enrollees" as "current contributions of enrollees" entitles OPM's eligibility decision to a presumption of correctness. This is not a novel doctrine. The Supreme Court has long held that "once an agency's statutory construction has been 'fully brought to the attention of the public and Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *United States v. Rutherford*, 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 487–89, 60 S.Ct. 982, 988–89, 84 L.Ed. 1311 (1940)); *accord North Haven Board of Education v. Bell*, 456 U.S. 512, 535, 102 S.Ct. 1912, 1925, 72 L.Ed.2d 299 (1982). Congress' silence on the eligibility issue when it amended the FEHBA thus operates as implicit endorsement of a refund of current rather than past contributions.

### B. *No Equitable Interest*

■ Plaintiffs are forced to agree with defendants that enrollees have no general equitable entitlement to the money held in their plan's special reserve. Any such entitlement would contravene the statutory scheme. To begin with, Congress contemplated that reserve balances would be carried over and used to defray increases in future rates. *See* H.Rep. No. 957 at 13. Moreover, § 8909(b) explicitly grants to OPM the discretion of using the contingency reserves to lower rates, reduce contributions or increase benefits. Recognition of general equitable interest in the reserves would both divest OPM of discretion granted by Congress and prevent exercise of the full range of options provided to OPM.

Plaintiffs, however, claim entitlement only to a "discrete sum of money" set aside as the refund. Pl.Mot. at 41. Plaintiffs distinguish the general contingency reserve from money that has already been "'earmarked' by defendants as surplus and refundable." Pl.Op. to Def.Mot. at 16. According to plaintiffs, by choosing to refund the money directly, rather than suspend withholding, for example, OPM created plaintiffs' equitable interest: "OPM's action to refund the surplus, and the undisputed fact that the surplus is directly related to the 'higher than necessary' premium payments made by plaintiffs in 1983 and 1984, is what gives rise to an equitable interest in plaintiffs." *Id.*

Plaintiffs' argument that OPM's discretionary choice of lowering FEHB reserves automatically raises an equitable interest would create rights out of a void and has no merit. Plaintiffs have to admit that they had no entitlement to the reserves before the refund was announced. They certainly do not argue that they should share in the usual ebb and flow of BCBSA reserves since a deficit year would require them to contribute the shortfall. Yet if plaintiffs could not claim a share before announcement of the refund, when, as they allege, their "higher than necessary premiums" had left a "bloated" surplus, why should the simple act of announcing a refund suddenly invent rights that did not exist the day before?

Moreover, in approving the refund, OPM merely selected one of several options for decreasing BCBSA's excessive surplus. OPM could have negotiated lower 1986 rates. It could have negotiated higher 1986 benefits. It could have reduced contributions by temporarily suspending withholding from 1985 enrollees' paychecks. If OPM had chosen any one of these alternatives, plaintiffs clearly would have no claim

---

in language to the annuitant provision of the first. Where, as here, the "operative language" of an original bill is "substantially carried forward" into the later statute, the legislative history of the unenacted bill is "wholly relevant to an understanding" of the statute eventually passed. *United States v. Enmons,* 410 U.S. 396, 404–05 n. 14, 93 S.Ct. 1007, 1012 n. 14, 35 L.Ed.2d 379 (1973).

of entitlement. Yet OPM, exercising the discretion specifically granted it by § 8909(b), chose the direct refund approach for managerial reasons such as flexibility, speed and minimal cost. R. 2. It would be absurd to recognize any equitable interest solely on the basis of a discretionary, administrative decision—the fortuity that OPM chose a refund among the other available options.[6]

### C. Consistency With Insurance Practice

■ At the outset we note that the FEHBA governs disposition of the reserves and expressly preempts state and local law. 5 U.S.C. § 8902(m)(1). Thus, the practice of the insurance industry is useful only as an analogy. Nonetheless, this practice supports OPM's decision to deny a share of the refund to past enrollees. The "ordinary rule" in the District of Columbia and elsewhere is that "an insured may not have any part of his premium returned once the risk attaches, even if it eventually turns out that the premium was in part unearned, unless there is an agreement to that effect." *North New York Savings Bank v. F.S.L.I.C.*, 515 F.2d 1355, 1359 (D.C.Cir. 1975) (quoting *Fleetwood Acres, Inc. v. F.H.A.*, 171 F.2d 440, 442 (2d Cir.1948)). This rule recognizes that although the insurer makes a profit, it is just compensation for the risks assumed by the underwriter. *North New York*, 515 F.2d at 1359 n. 5 (quoting Couch on Insurance 2d § 34:9). Here the risk has not only attached but long passed. The "ordinary rule" thus would bar plaintiffs' recovery. Their claim is particularly weak since plaintiffs are all no longer policyholders in the particular BCBSA plan or plan option in whose refund they seek to share. *See Lubin v. Equitable Life Assurance Society of United States*, 326 Ill.App. 358, 61 N.E.2d 753 (1945).[7]

Plaintiffs argue that defendants' reference to insurance practice is inapposite since plaintiffs do not claim an express statutory or contractual *right* to the refund. Pl.Opp. at 19. Plaintiffs' lack of any right to the refund is precisely what defendants are arguing. The insurance cases therefore, while not binding on OPM, provide persuasive support for its decision to exclude plaintiffs from the BCBSA refund.

### D. Administrative Convenience

■ Unlike OPM's other reasons for supporting a refund of "current" contributions, which are essentially legal, OPM's reference to administrative concerns raises a factual question. However, OPM merely assumes that a refund to past enrollees would be administratively difficult. There is no concrete evidence that including plaintiffs in the refund would significantly burden OPM. Mere speculation is not enough. Furthermore, BCBSA's willingness to consider other eligibility criteria, R. 99, suggests that the administrative problems of a refund to past enrollees would not be insurmountable. To the extent, therefore, that OPM's decision rests on administrative concerns, it is not supported by the record.

■ However, OPM's other stated reasons all support its decision not to refund to prior enrollees. Our analysis of these other reasons, discussed above, reveals that OPM acted reasonably. Accordingly, we find that with respect to OPM's decision that the refund should be confined to current enrollees, rather than also covering former enrollees whose premium payments were deposited into BCBSA's contingency reserve, OPM's action was not arbitrary, capricious, or otherwise not in accordance with the law.

---

6. Plaintiffs try to downplay the significance of their claimed equitable interest by characterizing the refund as an extraordinary event. Yet ten other carriers are now processing similar refunds, R. 511, and OPM's has amendment of its regulations will permit refunds in the future. 51 Fed.Reg. 7428, 7430 (1986).

7. As a similar analogy, if this were a case involving distribution of a corporate dividend, plaintiffs could not share in the dividend unless they were stockholders as of the record date. *See Nutter v. Andrews,* 246 Mass. 224, 142 N.E. 67 (1923).

### E. *1986 Refund to 1985 Enrollees*

■ OPM's decision, while valid, to offer the BCBSA refund to current rather than past enrollees raises the question of whether the agency acted arbitrarily or capriciously in nonetheless allowing payment to May 1, 1985 enrollees in the calendar year 1986. OPM justifies this practice for six reasons: (1) the decision was made and announced in 1985, (2) the 1986 rates had been set with the assumption that the proposed refund would deplete BCBSA's reserves of the refund amount, (3) an "open season" had intervened between announcement and implementation, (4) the annuitant legislation, an important part of the entire refund package, was not enacted until 1986 and Congress with full knowledge still approved the 1985 eligibility date, (5) no one ever contemplated execution of the refund proposal in 1985, and (6) other refunding plans had not worked out their own mechanics by the end of 1985.

The chief weakness in continuing to use the May 1, 1985 eligibility date, as plaintiffs stress, is that by the time the refund proceeds in 1986, its recipients are no longer "current" enrollees. As in 1985, many plaintiffs had left BCBSA or even the Government. By 1986, the same observation could be true of the 1985 enrollees eligible under the terms of the refund. Thus, OPM's insistence on a refund to "current" enrollees is logically inconsistent with its insistence that refund checks, mailed in 1986, go to those enrolled in 1985.

We see no way to avoid this inconsistency.[8] As the exchange of contract proposals demonstrates, refunding $784 million is a lengthy process. Particularly here where OPM needed first to secure a statutory amendment, it is hardly surprising that enrollment had shifted during the planning stages. If OPM had defined "current" enrollees as those enrolled at the time of refund rather than at the time of announcement, OPM would have distorted the inter-

vening "open season" by allowing new enrollees to opt into the refund.

It could also be argued that it is not in fact incongruous to view 1985 enrollees as still "current" in 1986. The operative date for distinguishing past and present could reasonably be the date of announcement rather than the date of refund. OPM's reference to 1986 rates in the Decisional Memorandum also supports its decision. By setting aside the $784 refund in considering 1986 rates, defendants treated this money as if it had already been refunded. Isolated from 1986 management of the plan, this refund in principle represents a reduction in 1985 contributions.

Furthermore, it should be remembered that Congress tacitly approved not just a reduction in "current" contributions but specifically a reduction in 1985 contributions. In his floor remarks on February 2, 1986, Senator Stevens noted that OPM had authorized rebates "as a method for reducing the 1985 contributions of subscribers." 132 Cong.Rec. S1725. In urging passage of the annuitant legislation—allowing refunds to proceed in 1986—he recognized that under the bill, rebates to annuitants would be authorized "even if made to annuitants enrolled in a plan as of a specific date in 1985...." *Id.* at S1726; *see also* H.Rep. No. 262 at 3. Congress thus was aware of OPM's plan to maintain a May 1, 1985 eligibility date despite refund payments in 1986. Congress' failure to register any disagreement with OPM's plan of distribution serves as implicit assent. *See United States v. Rutherford,* 442 U.S. at 554 n. 10, 99 S.Ct. at 2476 n. 10.

OPM's decision to view 1985 enrollees as still current enrollees in 1986 is therefore sustainable on the basis of the reasons OPM has advanced. The 1985 announcement, the negotiation of the 1986 rates without consideration of $784 million in the contingency reserve, the intervening open season, and Congress' approval all support

---

**8.** Consistency, while desirable, is not always possible and indeed is not a necessary guideline. We are reminded that a distinguished sage more than one hundred years ago said, "A foolish consistency is the hobgoblin of little minds adored by little statesmen, philosophers and divines." Ralph Waldo Emerson in his essay entitled *Self-Reliance.*

OPM's decision.[9] The fact that OPM's reasons for denying the refund to 1986, or to the actual "current" enrollees, do not justify excluding 1983 and 1984 subscribers is irrelevant. Once OPM decided to benefit current enrollees, the issue was how to identify current enrollees, not whether past enrollees should also qualify. Accordingly, we find that the record supports OPM's decision to use a May 1, 1985 eligibility date and that this decision was neither arbitrary, capricious nor not in accordance with law.

### F. *Equity*

█ Plaintiffs only authority to compel their inclusion in the refund is equity. Plaintiffs claim that BCBSA overcharged them, and that they should enjoy the fruit of their "excessive" premium payments, the refund. Simply stated, plaintiffs' equitable argument is that the refund is their money.

Plaintiffs' invocation of equity does not impress us. As we have emphasized, this case does not concern the proper level of premiums in 1983 and 1984. Whether BCBSA's huge Contingency Reserve—the basis for the refund—was fed by "excessive" premiums does not matter here. Plaintiffs voluntarily paid the premiums. Moreover, plaintiffs received the benefits for which they had contracted. Plaintiffs do not suggest that defendants somehow defrauded them in setting the premium charges. Yet having received the benefit of their bargain, plaintiffs now complain that equity demands restricting BCBSA's freedom to disperse the money received for providing the health insurance benefits it promised. Equity does not prescribe such a one-sided approach.

Furthermore, plaintiffs' restitutionary claims are not purely equitable. As defendants note, some plaintiffs may have submitted medical claims far in excess of their premium payments. These plaintiffs did not contribute to the surplus yet, if we adopted plaintiffs' distribution formula, would share in the "restitutionary" refund. Similarly, ten other carriers are presently implementing refunds, many if not all on the basis of a 1985 eligibility date. *See, e.g.*, R. 677, 688, 694, 699. If a plaintiff in the "Employee Class" switched to one of the new plans, he or she would receive a refund based on enrollment in 1985. An order requiring the BCBSA refund to include 1983 and 1984 enrollees would result in a double benefit for those plaintiffs— hardly an equitable result.[10] Plaintiffs' claim of equity has a hollow ring and is self-defeating.

### III. *Conclusion*

Plaintiffs premise their cause of action on a single, simple theory: equity. Yet plaintiffs have failed to prove that principles of equity of necessity mandate that they be included in the BCBSA refund. This attempt, while vigorously presented, falls short. In contrast, OPM's decision to permit the refund to benefit only the Government and persons enrolled as of May 1, 1985 is supported by the record and is not arbitrary, capricious or an abuse of discretion. We will not interfere with that decision.

Accordingly, we deny plaintiffs' motion and grant summary judgment for defendants.

An order consistent with the foregoing has been entered this day.

---

**9.** In view of these sufficient reasons, we do not need to consider OPM's other justifications.

**10.** Plaintiffs conveniently ignore not only these other refunding plans but also the impact of the BCBSA refunds on postal employees enrolled in 1983 and 1984. Plaintiffs' equitable theories apply equally to the postal subscribers, but plaintiffs do not represent these other BCBSA enrollees and seem to pretend they do not exist.