[No. B056809. Second Dist., Div. Three. June 8, 1993.]

BENJAMIN G. BARNES, Plaintiff and Appellant, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Defendant and Respondent.

**COUNSEL**

Priscilla R. Budeiri, William M. Shernoff, Frank N. Darras and Sharon J. Arkin for Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Frank Rothman, Darrel J. Hieber, Gary S. Glickman and Ben D. Whitwell for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—This is a class action brought on behalf of the policyholders of the defendant and respondent State Farm Mutual Automobile Insurance Company (State Farm) by the plaintiff and appellant Benjamin G. Barnes (Barnes). By this action, in its final form prior to appeal, Barnes sought to preclude State Farm from spending premium revenues on political activities opposed by dissenting policyholders; in addition, Barnes also sought to compel State Farm to distribute "excess" surplus funds to its policyholders in the form of an extraordinary dividend. The trial court sustained State Farm's demurrer to these two claims and dismissed the action. We conclude that Barnes has not stated a cause of action for relief on either of his claims and we therefore affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Barnes, a policyholder of State Farm, filed this action on August 15, 1988. In his original complaint he alleged four causes of action: (1) a claimed violation of his freedom of speech, (2) unfair and misleading business practices, (3) breach of fiduciary duty and (4) declaratory relief.[1]

The thrust of Barnes's original complaint was to preclude the expenditure of funds by State Farm in support of the no-fault insurance initiative that was on the November 1988 ballot. It was essentially alleged that: (1) State Farm, as a mutual automobile insurer, is owned by its policyholders; (2) Barnes was compelled by state law to obtain automobile insurance; (3) State Farm had already expended substantial amounts, and intended to spend additional sums, in support of the no-fault initiative; and (4) Barnes, and a class of similarly situated California policyholders,[2] objected to the expenditure by State Farm of its premium revenues in pursuit of that particular political goal.

Barnes's request for appropriate injunctive relief included two separate and successive motions for a preliminary injunction. The first sought to preclude State Farm from making *any* political expenditures; the second sought to require State Farm to establish a procedure designed to protect its policyholders' free speech rights by ensuring that dissenting policyholders' premiums are not used to fund political expenditures to which they object. Each of these motions was extensively briefed and argued and each was denied by the trial court.

---

[1]This original complaint also named as a defendant a group called the Insurance Industry Initiative Campaign Committee (also known as Citizens for No-fault Sponsored by California Insurers). Subsequently, this defendant was dismissed pursuant to stipulation.

[2]No class was ever certified by the trial court.

Thereafter, on May 22, 1989, Barnes filed a first amended complaint which was substantially the same as the original pleading, except that an additional count was added which sought to compel State Farm to distribute "its unjustifiably large surplus" back to its policyholders.[3] In support of this cause of action, Barnes alleged that State Farm had accumulated a surplus fund consisting of premiums and investment income in excess of $10 billion. This, Barnes alleged, had resulted in a gross overcapitalization which was compounded by the fact that State Farm, in 1988, had paid out dividends which were less than 10 percent of the industry average. Barnes alleged that such conduct by State Farm amounted to an unjustified hoarding of surplus funds, for no legitimate business purpose and all to the detriment of policyholders who otherwise could have received either reduced premium rates or substantial dividends. He sought a court order which would require State Farm's directors to correct this imbalance by a one-time extraordinary dividend and to avoid the problem in the future by regular dividends which conformed to the "industry average."

State Farm filed a demurrer to this first amended complaint. In response, Barnes agreed to dismiss all counts except (1) the claim for violations of policyholders' free speech rights resulting from use of premium revenues for political activities which were not supported by dissenting shareholders and (2) the cause of action seeking to compel distribution of the allegedly excessive surplus. The court overruled the demurrer as to the former and sustained it as to the latter, but *with* leave to amend.[4]

On August 8, 1990, Barnes filed his second amended complaint, the one now before us, in which he repeated the first claim found sufficient by the court, although in a somewhat broadened form, and realleged the second in substantially the same language. State Farm again demurred on the ground that no cause of action was stated by either of Barnes's claims. This time, the court agreed as to both counts. The demurrer was sustained *with leave* to amend as to the first cause of action relating to the policyholder free speech issue and *without* leave as to the second cause of action regarding disposition of the allegedly excessive surplus.[5] With respect to this latter claim, the court not only found that Barnes had failed to allege sufficient facts of

---

[3]This new claim was allegedly asserted on behalf of a nationwide class of 51,000,000 State Farm policyholders. This class was likewise never certified.

[4]In sustaining this demurrer, the court noted, "[t]he court does believe . . . that there has not been a statement of sufficient facts to constitute a cause of action. Certainly not under the business judgment rule."

[5]The court's order sustaining State Farm's demurrer provides, in pertinent part: "State Farm's Demurrer to the First Cause of Action in the Second Amended Complaint is sustained with leave to file an amended complaint within forty-five days. But Plaintiff may file an amended complaint only if, after investigation, Plaintiff can allege in good faith that State

director fraud or oppression so as to overcome the "business judgment" rule, but also that he had failed to allege the necessary exhaustion of administrative remedies now provided for in the Insurance Code for the regulation of premium rates to be paid by policyholders. (Ins. Code, § 1861.05 et seq.)[6]

Although Barnes was granted leave to amend his first cause of action, he chose not to do so and the parties stipulated that a judgment dismissing the entire second amended complaint could be entered so that an appeal could be taken on the issues framed by the allegations of that pleading. A judgment was entered and Barnes noticed this timely appeal.

### Issues Presented

This appeal essentially raises three issues.

1. Does a policyholder of a mutual insurance company have a constitutionally protected right to prevent the insurer's use of premium revenue to support political activities with which the policyholder disagrees?

2. May a policyholder of a mutual insurance company object to, or seek judicial assistance to control, the insurer's maintenance, management and disbursement of surplus funds?

3. Must a policyholder of a mutual insurance company first exhaust available administrative remedies before judicial intervention may be sought

---

Farm has used capital surplus for contributions to a candidate's campaign for public office. Plaintiff is not permitted to include allegations that State Farm has expended funds in support of or in opposition to initiative measures, engaged in advertising, or made any expenditure other than contributions to a candidate's campaign for public office. [¶] State Farm's Demurrer to the Second Cause of Action in the Second Amended Complaint is sustained without leave to amend because (a) after several opportunities, Plaintiff has failed to allege facts sufficient to state a cause of action under the business judgment rule; and (b) Plaintiff has failed to allege that he exhausted his administrative remedies prior to instituting this action."

[6]As the trial court put it at the time it orally announced its ruling on State Farm's demurrer: "The law provides for matters having to do with excessiveness of rates to be brought before the Insurance Commissioner. Hearings are provided under 1861.08. Consumer participation is provided in 1861.10. An Insurance Commissioner has just been elected to enforce these laws, the first elected Commissioner of Insurance. [¶] It appears to this Court that before a Court should be asked to take the actions called for in the second cause of action that the Court should have the benefit of the expertise that is applied when administrative procedure is followed. It is a proper procedure on the part of a Court where there is an administrative procedure to require that that be followed before litigation is undertaken. And such allegation is not made in the second cause of action. [¶] It isn't made because there was no seeking of administrative assistance as provided for by law. This is another basis on which the Court sustains the demurrer to the second cause of action without leave to amend. The Court is not going to consider what would happen if there were such administrative procedure undertaken and the results asked for in this case not achieved. The Court will not indulge in that speculation at this time as to what would happen then."

with respect to the insurer's maintenance, management or disbursement of surplus funds?

DISCUSSION

1. *Standard of Review*

■ As this matter comes to us on a judgment of dismissal following the trial court's order sustaining State Farm's demurrer, we must assume the truth of all facts which are properly pleaded. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) However, at least with respect to Barnes's first cause of action, which he declined to amend although given the opportunity to do so, we also must assume that he has alleged the strongest case that he can; "if the [cause of action] is objectionable on any ground, the judgment of dismissal must be affirmed." (*Hiemstra* v. *Huston* (1970) 12 Cal.App.3d 1043, 1045 [91 Cal.Rptr. 269]. See also *Cal Francisco Inv. Corp.* v. *Vrionis* (1971) 14 Cal.App.3d 318, 321 [92 Cal.Rptr. 201].)

The issue before us is one of law. Assuming the truth of Barnes's factual allegations, has he alleged any claim cognizable under California law? The answer, as we discuss below, is no.

2. *No Invasion of the Constitutional Right of Policyholders Has Been Alleged*

■ In his first cause of action, Barnes alleged that State Farm's political expenditures and contributions infringed on the free speech rights of its dissenting California policyholders under article I, section 2 of the California Constitution. ■ ■ ■ However, this claim ignores the free speech rights of State Farm.[7]

■ Political expenditures and contributions are forms of political speech " 'at the core of . . . First Amendment freedoms.' " *Buckley* v. *Valeo* (1976) 424 U.S. 1, 39 [46 L.Ed.2d 659, 699, 96 S.Ct. 612] (quoting *Williams* v.

---

[7]Barnes frames his argument under the California Constitution on the basis that it "independently establishes a zone of protection that is broader [than the protection provided by the First Amendment]." (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177].) However, both Barnes and State Farm rely upon and argue the merits of a number of federal First Amendment cases. In our view, this recognizes a simple reality. State Farm's free speech rights, which we find to be decisive on this issue, are at least as protected under the California Constitution as they are under the First Amendment. Moreover, any conflict between the two which purported to reduce State Farm's free speech protection would obviously be resolved under the federal Constitution. For that reason we join the parties in discussing this issue by reliance on the controlling federal authority.

*Rhodes* (1968) 393 U.S. 23, 32 [21 L.Ed.2d 24, 32, 89 S.Ct. 5]). In *Buckley*, the Supreme Court held that statutory restrictions on campaign contributions and expenditures "operate in an area of the most fundamental First Amendment activities." (424 U.S. at p. 14 [46 L.Ed.2d at pp. 684-685].) The court therefore concluded that any restriction on political contributions or expenditures must be subjected to strict constitutional scrutiny. (*Id.* at pp. 24-25, 44-45 [46 L.Ed.2d at pp. 690-691, 702-703].)

This protected right is not lost or diminished simply because it is claimed by a corporate entity. (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 781-784 [55 L.Ed.2d 707, 720-723, 98 S.Ct. 1407].) In *Bellotti*, the court overturned a state statute which prohibited "corporation[s] carrying on the business of . . . insurance. . . ." from making campaign contributions and expenditures "on any question[s] submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation." (*Id.* at 768 and fn. 2 [55 L.Ed.2d at pp. 712-713].) The court recognized that contributions and expenditures "that otherwise would be within the protection of the First Amendment" do not "lose[] that protection simply because [their] source is a corporation." (*Id.* at p. 784 [55 L.Ed.2d at pp. 722-723].)

The *Bellotti* court held that a corporation's right to express its views on issues of general public interest—including issues that do not "materially affect[]" its business—may not be restricted unless a "compelling" state interest is shown. (435 U.S. at pp. 781-783, 785-786 [55 L.Ed.2d at pp. 720-722, 723-724].) In *Bellotti*, the Commonwealth of Massachusetts attempted to justify its statute by arguing that the restriction on campaign contributions and expenditures was necessary to "protect[] the rights of shareholders whose views differ from those expressed by management on behalf of the corporation." (*Id.* at 787-788 [55 L.Ed.2d at pp. 724-725].) That is essentially the same argument which Barnes has advanced here.

The Supreme Court rejected the Commonwealth's argument because it held that the rights of dissenting shareholders "are not implicated in the case." (*Bellotti, supra,* 435 U.S. at p. 788 [55 L.Ed.2d at p. 725].) The court recognized that shareholders ultimately decide "whether their corporation should engage in debate on public issues" by, for example, "elect[ing] the board of directors" or seeking "protective provisions in the corporation's charter." (*Id.* at pp. 794-795 [55 L.Ed.2d at pp. 729-730].) Thus, through "intracorporate remedies," the shareholders "are presumed competent to protect their own interests." (*Id.* at p. 795 [55 L.Ed.2d at pp. 729-730].) Finally, as we emphasize below, if those remedies prove ineffective in persuading the corporation to endorse a particular view or to take or refrain

from taking specific action, dissenting shareholders are free to sell their stock.

The Supreme Court repeatedly has reaffirmed *Buckley* and *Bellotti* and extended their holdings to a variety of situations. (See, e.g., *Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 532-533 [65 L.Ed.2d 319, 324-325, 100 S.Ct. 2326] [invalidating order prohibiting public utility from including "inserts" in monthly bills promoting its position on "controversial issues of public policy"]; *Citizens Against Rent Control* v. *City of Berkeley* (1981) 454 U.S. 290, 298-299 [70 L.Ed.2d 492, 500-501, 102 S.Ct. 434] [invalidating provisions of ordinance that restricted contributions and expenditures to committees formed to support or oppose ballot measures]; *Federal Election Comm'n* v. *National Conservative Political Action Comm.* (1985) 470 U.S. 480, 482, 501 [84 L.Ed.2d 455, 460, 105 S.Ct. 1459] [invalidating provisions of federal statute that restricted contributions and expenditures to presidential candidates].)

In addition, federal and California appellate courts also have consistently applied *Bellotti*, protecting corporations' First Amendment rights to participate freely in the political process. (See, e.g., *C & C Plywood Corp.* v. *Hanson* (9th Cir.1978) 583 F.2d 421, 425 [statute "which forbids payments or contributions by corporations in support of or opposition to ballot issues is an unconstitutional restriction of corporate First Amendment rights."]; *Quinn* v. *Aetna Life & Casualty Co.* (2d Cir. 1980) 616 F.2d 38, 39-40 [dismissing action to enjoin publication of insurance company's "advertisements," which criticized large tort damage awards]; *Citizens For Jobs & Energy* v. *Fair Political Practices Comm'n* (1976) 16 Cal.3d 671, 672, 675 [129 Cal.Rptr. 106, 547 P.2d 1386] [invalidating statute limiting "the amount that may be spent to influence the electorate to vote for or against a statewide ballot proposition"]; *Pacific Gas & Elec. Co.* v. *City of Berkeley* (1976) 60 Cal.App.3d 123, 129 [131 Cal.Rptr. 350] [invalidating ordinance prohibiting corporations from making political contributions and expenditures].)

Barnes argues that this well-established corporate right of free political expression somehow does not extend to a *mutual* insurance company; that is, one owned by its policyholders rather than by shareholders. Barnes cites no authority for this proposition and we have found none. Moreover, such a proposition is directly contrary to the express language of the Insurance Code provisions relating to mutual insurers. A mutual insurer is defined as "an insurance corporation without capital stock owned by its policyholders collectively, who have the right to vote in the election of its directors." (Ins. Code, § 4010.) It is "subject to all provisions of this code

applicable to other incorporated insurers, except where otherwise provided . . . [and] [t]he provisions of Section 1140[8] shall apply to such an insurer except that the provisions of the Corporation Law referring to shareholders or members shall be applied as though such provisions referred to the policyholders or members of a mutual." (Ins. Code, § 4012.) "Each policyholder of a domestic mutual insurer . . . is a member of the insurer during the period of insurance with all rights and obligations of such membership . . . ." (Ins. Code, § 4013) and "shall have the same character of rights and relationship as a stockholder has toward a domestic stock insurer subject to the provisions of this code." (Ins. Code, § 4015.)

The affairs of a mutual insurer, like the affairs of any other corporation, are "managed by a board of directors." (Ins. Code, § 4020; 2 Couch, Cyclopedia of Insurance Law (2d ed. 1984) § 19:29 ["[t]he principles governing the duties and powers of directors . . . of a mutual company are in general the same as those applicable to a comparable corporation. . . ."].) Each director must be a policyholder. (Ins. Code, § 4022.)

Finally, the directors of a mutual insurer "may from time to time"—but are not required to—pay a dividend to the policyholders. (Ins. Code, § 4050.) The use of the word "may" in the code "subjects the payment of dividends to the sound discretion of the directors." (18 Appleman, Insurance Law & Practice (1945) § 10061.)

It seems obvious that a policyholder of a mutual insurer enjoys the same legal rights and remedies as a shareholder in a stock company. Thus, there is no basis for treating mutual insurers differently from stock companies for purposes of evaluating and enforcing their rights and obligations under the First Amendment.

We have little trouble rejecting Barnes's contention that his rights as a dissenting policyholder are impermissibly subordinated to those of his insurer. His argument rests almost entirely on the reasoning of the Supreme Court's decision in *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782]. Barnes claims that State Farm's political expenditures and contributions violated his speech rights because he is compelled by law to purchase automobile liability insurance in order to drive in California. An examination of *Abood* demonstrates that it provides no support for Barnes's argument.

In *Abood*, public school teachers were compelled, *as a condition of employment*, to pay union dues or a "service fee" to their exclusive bargaining representative. (*Abood, supra*, 431 U.S. at p. 211 [52 L.Ed.2d at p. 269].)

---

[8]Insurance Code section 1140 provides: "Except as otherwise provided in this code, incorporated insurers are subject to the provisions of the general corporation law in like manner with other corporations."

The statute authorized the union to use a portion of these fees to further "political purposes" unrelated to its function as the teachers' bargaining representative. (*Id.* at p. 215 [52 L.Ed.2d at pp. 271-272].) The Supreme Court upheld the right of the union to require " 'financial support of the collective-bargaining agency by all who receive the benefits of its work. . . .' " (*Id.* at p. 219 [52 L.Ed.2d at pp. 273-274], quoting *Railway Employes' Dep't* v. *Hanson* (1956) 351 U.S. 225, 238 (100 L.Ed. 1112, 1133-1134, 76 S.Ct. 714).) But the court held that the union constitutionally could not compel the payment of service fees to further " 'political purposes' *unrelated to collective bargaining.*" (*Id.* at pp. 215, 235-236 [52 L.Ed.2d at pp. 275-276, 284-285], italics added.)

The Supreme Court has applied *Abood* only when an individual has been compelled, as a condition of employment, to join or pay a "service fee" to a designated association. (See *Keller* v. *State Bar* (1990) 496 U.S. 1, 4-5 [110 L.Ed.2d 1, 8-9, 110 S.Ct. 2228] [attorneys required "as a condition of practicing law in a State" to join and pay dues to " 'integrated bar' "]; *Chicago Teachers Union, Local No. 1* v. *Hudson* (1986) 475 U.S. 292, 294-295, 302-303 & fn. 10 [89 L.Ed.2d 232, 239-240, 106 S.Ct. 1066] ["nonunion members" required to pay "a fee" to union "acting as their bargaining representative"]; *Ellis* v. *Brotherhood of Ry., Airline & S.S. Clerks* (1984) 466 U.S. 435, 438-439 [80 L.Ed.2d 428, 435-436, 104 S.Ct. 1883] ["all employees in the relevant bargaining unit" required "to join the union as a condition of continued employment"].) The court has held that *Abood* is inapplicable when an employee *voluntarily* decides to join a union or an association. (*Bellotti, supra,* 435 U.S. at p. 794, fn. 34 [55 L.Ed.2d at p. 729].)

Here, there was no compulsion for Barnes to join or pay a fee to a designated association. Barnes constructs his argument around the question-able proposition that the legal ability to drive a car in California is a "practical necessity of life" and in order to have such ability one must purchase a policy of liability insurance. Even assuming the viability of the point, Barnes is not required to purchase that insurance from State Farm. Indeed, Barnes himself does not, and cannot, make such a contention. What he does contend, however, is that the termination of his voluntary associa-tion with State Farm would result in the forfeiture of his interest in the existing surplus. This argument ignores the principle that Barnes has no such interest until such time as the board of directors declares a dividend payable

from such surplus. (*Northwestern Mutual Life Ins. Co.* v. *Roberts* (1918) 177 Cal. 540, 547-548 [171 P. 313].)[9]

As the *Bellotti* court emphasized in rejecting the application of *Abood* (and an earlier case with a similar factual context, *Machinists* v. *Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 81 S.Ct. 1784]), the decision "involved the First Amendment rights of employees in closed or agency shops not to be compelled, as a condition of employment, to support with financial contributions the political activities of other union members with which the dissenters disagreed." (*Bellotti, supra,* 435 U.S. at p. 794, fn. 34 [55 L.Ed.2d at p. 729].) In language of relevance here, the court went on to note, "The critical distinction here is that no shareholder has been 'compelled' to contribute anything. Apart from the fact . . . that compulsion by the State is wholly absent, the shareholder invests in a corporation of his own volition and is free to withdraw his investment at any time and for any reason. A more relevant analogy, therefore, is to the situation where an employee voluntarily joins a union, or an individual voluntarily joins an association, and later finds himself in disagreement with its stance on a political issue. The *Street* and *Abood* Courts did not address the question whether, in such a situation, the union or association must refund a portion of the dissenter's dues or, more drastically, refrain from expressing the majority's views. In addition, even apart from the substantive differences between compelled membership in a union and voluntary investment in a corporation or voluntary participation in any collective organization, it is by no means an automatic step from the remedy in *Abood*, which honored the interests of the minority without infringing the majority's rights, to the position . . . which would completely silence the majority because a hypothetical minority might object." (*Ibid.*)

In our view, this lack of compulsion and the clear application of *Bellotti* are dispositive of Barnes's claims with respect to his first cause of action.[10] The trial court's ruling as to that count was correct.

---

[9]As the *Northwestern* court put it, "[T]here is no agreement, either express or implied, between the premium payer and the mutual benefit company or association of which he is a member, to the effect that he shall have insurance at cost, or that he shall have any enforceable right to receive or recover any amount in the form of a return premium or otherwise corresponding to the excess which he has paid in premiums over the cost of insurance. The amount of premium to be paid by each member is fixed by a consideration of the business principles governing successful insurance companies or associations whether they are stock or mutual benefit concerns. The premium once paid is gone from its payer forever . . . ." (177 Cal. at pp. 547-548.) (Italics added.)

[10]Even the *Abood* court recognized that compelled contributions could be utilized for a union's political expenditures if they were *related* to collective bargaining. (431 U.S. at p. 236 [52 L.Ed.2d at p. 285].) By analogy, even if we were to conclude that Barnes's contributory

### 3. *A Policyholder Has No Right to Require a Particular Distribution From Surplus*

 Barnes, as a policyholder, seeks to obtain judicial compulsion for the declaration of an "extraordinary dividend" by State Farm from its accumulated surplus; he seeks to bring that surplus down to "a more reasonable level" and also to maintain that level by requiring regular dividends in the future which conform to what he alleges is the insurance industry standard for property and casualty companies. Leaving aside the procedural niceties,[11] what Barnes is doing here is attacking the business judgment of State Farm's directors.

Whether "a private corporation should declare and pay a dividend, or make a distribution of its assets is a matter committed to the sound business judgment of the corporation's board of directors." (*Estate of Talbot* (1969) 269 Cal.App.2d 526, 537 [74 Cal.Rptr. 920]; see generally, 9 Witkin, Summary of Cal. Law, *supra*, Corporations, § 175.) It is thus the general rule that a court will not interfere with a corporate decision to withhold dividends in the absence of a showing of abuse of the wide discretion which the courts grant to corporate directors.

 As one California court recently summarized the rule, "The common law 'business judgment rule' refers to a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. The business judgment rule is premised on the notion that those to whom the management of the corporation has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is one which is ' " '. . . helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes . . . ,' " ' and establishes a presumption that directors' decisions are based on sound business judgment. [Citation.] Under this rule, a director is not liable for a mistake in business judgment which is made in good faith and in what he or she believes to be the best interests of the corporation, where no

---

relationship with State Farm were compelled, it would follow that its alleged political expenditures which were germane to its insurance business should nonetheless be permissible. Barnes did not anywhere allege nor does he here claim that State Farm's expenditures were not germane to its insurance business.

[11]Prior to filing suit, Barnes made no demand upon State Farm's directors that they declare a dividend, nor does he allege or claim that such a demand would have been futile. Such a demand, or demonstration of futility, is a required procedural prerequisite to the bringing of a shareholder suit to compel action by a corporation. (9 Witkin, Summary of Cal. Law, (9th ed. 1989) Corporations, § 184, p. 679.)

conflict of interest exists. [Citations.]" (*Gaillard* v. *Natomas Co.* (1989) 208 Cal.App.3d 1250, 1263 [256 Cal.Rptr. 702].[12]

 Barnes, although attempting to plead himself within this rule, has failed to allege facts showing that the director's decision regarding the accumulation of State Farm's surplus was not made in good faith or in what the directors believed to be the best interests of the corporation. He has alleged no facts demonstrating fraud, oppression, corruption or conflict of interest by the directors. Indeed, he appears to rest his claim upon the singular proposition that State Farm's surplus and dividend policy differs significantly from an industry average.[13] This is clearly insufficient to permit a court to interfere in the management of an apparently successful corporate enterprise.[14]

[12]In California, the business judgment rule is codified in Corporations Code section 309, subdivision (a), which provides in pertinent part: "A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. . . ."

[13]In language of direct application here, an Illinois court stated, "[I]t cannot be said that directors . . . must follow the lead of the other corporations in the field. Directors are elected for their business capabilities and judgment and the courts cannot require them to forego their judgment because of the decisions of directors of other companies. *Courts may not decide these questions in the absence of a clear showing of dereliction of duty on the part of the specific directors and mere failure to 'follow the crowd' is not such a dereliction.*" (*Shlensky* v. *Wrigley* (1968) 95 Ill.App.2d 173 [237 N.E.2d 776, 781], italics added.) Other Illinois cases reach similar conclusions. (See, e.g., *Coduti* v. *Hellwig* (1984) 127 Ill.App.3d 279 [469 N.E.2d 220, 226] [courts will not interfere with directors' discretion unless decision to withhold dividends is " 'fraudulent, oppressive or totally without merit' "]; *Fields* v. *Sax* (1984) 123 Ill.App.3d 460 [462 N.E.2d 983, 989] ["[a]bsent evidence of bad faith, fraud, illegality, or gross overreaching, courts are not at liberty to interfere with the exercise of business judgment by corporate directors"]; *Lubin* v. *Equitable Life Assurance Soc'y* (1945) 326 Ill.App.3d 358 [61 N.E.2d 753, 758] [complaint seeking to compel mutual insurer to declare dividends insufficient without factual allegations showing that "directors acted unlawfully, wrongfully or by mistake"].)

Illinois is State Farm's state of incorporation and State Farm argues that its law governs questions relating to application of the business judgment rule. Although Barnes disputes this, he concedes that there is no conflict in the law of California and Illinois on this point. That being the case, it makes no difference which law we apply to this issue. (*International Service Ins. Co.* v. *Gonzales* (1987) 194 Cal.App.3d 110, 116 [239 Cal.Rptr. 341].)

[14]The trial court's observations on this issue are both appropriate and worthy of emphasis here: "Now, what the plaintiffs are asking the Court to do, in effect, is to take over and establish the dividends and surplus terms for this corporation. I think it must be apparent that a Court is ill-suited to attempt to substitute its judgment for the Board of Directors of defendant for the purpose of determining what its dividends and surplus policies ought to be. In effect, this is a mini-receivership that is sought. [¶] That is not to say that under no circumstances will a Court intervene in a case involving the dividend and surplus policy of a mutual insurance company. There are situations where the law would allow it. But there must be a showing of facts that would set forth, and not just in a conclusory way, that there has

Apart from an alleged divergence from some purported industry standard, Barnes's argument seems to boil down to the proposition that the surplus is just too "fat" and thus is "unjustified and unconscionable"; he insists that it is being accumulated at the expense of the policyholders "and with no possible rational justification." To the extent that he is relying upon his contention that policyholders have some legal claim upon the surplus, we have already discussed and rejected that proposition. Otherwise, his allegations are wholly conclusionary. In spite of being given the opportunity to amend this claim when he was permitted to file a second amended complaint, he has provided no *facts* to satisfy the clear and fundamental requirements of the business judgment rule.

We thus conclude that the trial court was correct in rejecting the allegations of Barnes's second cause of action as insufficient to state a cognizable claim. There is, however, an additional and alternative reason why that cause of action fails.

### 4. *Barnes Failed to Exhaust His Administrative Remedies*

■ A plaintiff is required to exhaust all administrative remedies as a jurisdictional prerequisite to judicial relief. (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 292-293 [109 P.2d 942, 132 A.L.R. 715].) "In California it is a fundamental rule of procedure that 'where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act . . . .' This is a jurisdictional prerequisite, not a matter of judicial discretion." (*Yamaha Motor Corp.* v. *Superior Court* (1986) 185 Cal.App.3d 1232, 1240 [230 Cal.Rptr. 382], quoting *Abelleira, supra,* 17 Cal.2d at p. 292.)

This is true even if the administrative agency cannot provide the precise relief requested—to allow the agency to bring its expertise to bear on the complex issues. (*Westlake Community Hosp.* v. *Superior Court* (1976) 17 Cal.3d 465, 476 [131 Cal.Rptr. 90, 551 P.2d 410] ["[By requiring exhaustion] courts accord recognition to the 'expertise' of the [administrative] tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance."]; *Karlin* v. *Zalta* (1984) 154 Cal.App.3d 953, 983 [201 Cal.Rptr. 379]; see also *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 391 [6 Cal.Rptr.2d 487, 826 P.2d 730] [primary jurisdiction doctrine "enhances court decisionmaking and efficiency by allowing courts

---

been fraud or oppression on the part of the Board of Directors or a lack of merit in the manner in which their work is performed, or that their work has resulted in a breach of law or mistake or other wrongful [act]. The mere fact that this corporation has a surplus of $20 billion, massive though that is, does not show facts—this does not constitute a fact that would warrant this Court in taking over the dividend and surplus policy of this company."

to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws"].)

■ To the extent the second cause of action sought "a reduction in premiums" or "appropriate rates of insurance for the policyholders" of State Farm, California law offers an appropriate administrative procedure that Barnes was required to exhaust. As the trial judge recognized, California's Proposition 103 provides detailed regulatory standards and procedures governing the setting and adjustment of insurance rates. (Ins. Code, §§ 1861.05, subd. (a), 1861.10, subd. (a).)

Barnes would fare no differently on this issue if we applied Illinois law to the question of exhaustion of administrative remedy. To the extent the second cause of action sought "to interfere in the management of the dividend and surplus policy of State Farm," the law of State Farm's domicile clearly would provide the appropriate administrative procedure. Under Illinois law, Barnes's second cause of action can be brought only by the Illinois Director of Insurance.

Section 201 of the Illinois Insurance Code provides that "[n]o order [or] judgment . . . interfering with the prosecution of the business of any [insurance] company . . . shall be made or granted otherwise than upon the complaint of the [Illinois] Director [of Insurance] represented by the Attorney General . . ." (Ill. Ann. Stat. ch. 73, par. 813, § 201 (Smith-Hurd 1965).) The rationale behind section 201 is that insurance companies "have characteristics which entitle them to be regarded almost as public in their nature." (*People* ex rel. *Benefit Ass'n of Ry. Employees* v. *Miner* (1944) 387 Ill. 393 [56 N.E.2d 353, 356], cert. den. 324 U.S. 840 [89 L.Ed. 1402, 69 S.Ct. 586].) Thus, "the State [of Illinois], and not the courts, has authority under its police power, for the protection of the public, to supervise the operations of insurance companies." (*Id.* at p. 354.)

The Illinois Supreme Court recognized that there is "no ambiguity in section 201 of the Insurance Code"; it "plainly prohibits the making or entering of any order . . . interfering with the prosecution of the business of any insurance company." (*People* ex rel. *Benefit Ass'n of Ry Employees* v. *Miner, supra,* 56 N.E.2d at p. 355.) Section 201 does not forbid maintenance of a suit that interferes with the business of an insurance company, "but, because of the public interest in the business, forbids such a suit by an individual. . . ." (56 N.E.2d at p. 356.) The individual "ha[s] his *remedy by application to the Director of Insurance.*" (*Ibid.*) (Italics added.)

As these authorities demonstrate, Barnes had an obligation to first exhaust his administrative remedies before commencing this action. This he admittedly failed to do. We therefore agree with the trial judge that for this

additional and alternative reason, the demurrer to the second cause of action was properly sustained.

## DISPOSITION

The judgment of dismissal is affirmed. Costs on appeal to State Farm.

Klein, P. J., and Kitching, J., concurred.