[No. B146586. Second Dist., Div. Six. Sept. 19, 2002.]

PAMELA C. BIREN, Plaintiff, Cross-defendant and Appellant, v. EQUALITY EMERGENCY MEDICAL GROUP, INC., et al., Defendants Cross-complainants and Appellants.

**COUNSEL**

Lascher & Lascher, Denise A. Brogna and Gabriele Mezger-Lashly for Plaintiff, Cross-defendant and Appellant.

Zimmerman Walker & Monitz, Scott L. Zimmerman and Jeffrey C. Walker for Defendants, Cross-complainants and Appellants

**OPINION**

**GILBERT, P. J.**—Five physicians create a business to provide emergency care in hospitals. The business consists of two corporations in which each physician is a corporate officer, director, and 20 percent shareholder.

This appeal involves a dispute between director, chief financial officer, and shareholder Pamela C. Biren, and the other four directors, officers, and shareholders. Here we conclude, among other things, that the business

judgment rule may protect a director who acts in a mistaken but good faith belief on behalf of the corporation without obtaining required shareholder approval.

Equality Emergency Medical Group, Inc., and E.E.M.G.-SIMI, Inc. (collectively Equality), appeal the judgment in favor of cross-defendant Biren regarding breach of fiduciary duty and damages. Equality and the individual defendants Kenneth Corre, Emanuel K. Gordon, David Kalmanson and Michael Vitullo (who for convenience are also hereafter referred to collectively as Equality) appeal the denial of their costs and attorney's fees. Biren cross-appeals regarding valuation of her corporation shares and her liability for failing to pay pension plan contributions.

As to Equality, we conclude among other things, that the trial court properly decided that Biren's acts and omissions are protected by the business judgment rule. The court also properly rejected Equality's evidence on its $2 million damage claim. We conclude that Equality is not a prevailing party in the litigation for costs and attorney's fees, but the trial court erred by denying it attorney's fees under Code of Civil Procedure section 998.[1]

As to Biren, we conclude the trial court did not err by finding that she breached the "Shareholders' Agreement" (Agreement) or by calculating the value of her shares according to the redemption formula in the Agreement. Sufficient evidence also supports the finding that Biren was negligent for failing to pay pension plan contributions timely.

We reverse the order denying Equality attorney's fees under section 998 but otherwise affirm the judgment.

## FACTS

In 1988, emergency room physicians Biren, Kenneth Corre, Emanuel K. Gordon, David Kalmanson, and Michael Vitullo formed Equality Emergency Group, Inc., to provide emergency room services to hospitals under contract. Each physician owned 20 percent of the corporation's shares, was a member of the board of directors, and served as a corporate officer. In 1991, Biren became the chief financial officer and later assumed responsibility for oversight of patient billing. In 1995, the physicians formed E.E.M.G.-SIMI, Inc., to segregate accounting and billing for Simi Valley Hospital from other hospitals that Equality serviced. The shareholder physicians treated the two corporations as one business.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

On November 14, 1990, the five physicians entered into a written Agreement detailing their relationship and governing management of Equality. Paragraph 3.06 of the Agreement provided: "The following corporate actions shall require the prior written consent of Shareholders holding a majority of Shares entitled to vote on matters affecting the Corporation: . . . (ii) Entry into contracts for the provision of the following services to the Corporation: . . . B. Billing."

Shortly thereafter, the shareholders amended paragraph 3.06 to delete the formality of a writing. The amendment conformed to the shareholders' practice of voting orally on important matters, including engaging a billing company. Although paragraph 5.11 of the Agreement required amendments to be in writing, the shareholders did not execute a written amendment.

In 1994, Equality transferred its patient and insurance billing to Gottlieb Financial Services (Gottlieb) in Florida. Timely and accurate billing of Equality's physician services was vital to the cash flow and profitability of the business, which employed other physicians and office personnel. At trial, expert witness Daryl Favale testified that "huge [and] not insignificant differences" exist among billing companies and that performances "can be off 30 percent, 40 percent."

In early 1997, Biren learned that Gottlieb had fallen significantly behind in billing for Equality. Biren's and Equality's office manager, Liz Lopez, met with Gottlieb's vice-president, Randy Wilson, to discuss the problem. Wilson assured them that Gottlieb was "going to turn [the backlog] around" by adding employees to service the Equality account and by opening an office on the west coast.

Nevertheless, the billing situation did not improve and in June 1997 Biren ceased sending patient charts to Gottlieb because it was "so far behind." Lopez investigated other billing companies "to brainstorm" a resolution to the billing standstill.

In mid-August 1997, Biren and Lopez learned that Gottlieb completely stopped billing for Equality. Lopez telephoned Gottlieb's employees David Imler and Sharon Sing and learned that Gottlieb had reassigned employees to other accounts. Moreover, due to management problems, there occurred a "mass exodus" of Gottlieb employees. Lopez again investigated other billing companies but was unable to locate one that could immediately process Equality's billing.

Biren and Lopez also consulted Michael Weitz, a Santa Monica physician, who was experiencing similar billing problems with Gottlieb. Weitz stated

that he was "pretty sure" that he would transfer his billing matters to Physician and Hospital Support Services, Inc. (PHSS), a company created by former Gottlieb employee Sharon Sing. Weitz informed Lopez that he had checked references regarding Sing and received "a solid recommendation." Lopez also contacted Gottlieb's vice-president Wilson and obtained "a positive" reference concerning Sing.

On August 14, 1997, Biren terminated Gottlieb and orally authorized PHSS to process Equality's billing. She stated to Lopez that "it was an emergency crisis situation and . . . as CFO . . . it was her fiduciary responsibility to maintain the financial stability of the [business] and make a quick and emergency decision." Biren did not obtain prior shareholder approval for terminating Gottlieb and contracting with PHSS; she stated that she acted alone because the other directors were either on vacation or otherwise unavailable.

Sing represented to Biren that PHSS was employing former Gottlieb employees and that it would process Equality's billing within five days of receipt of patient charts.

Biren promptly notified Gordon and Kalmanson of the change of billing companies. To her, they expressed no opposition and therefore she believed they had no objection to her actions. She mistakenly believed that she had the authority to contract on behalf of Equality. On February 2, 1998, without consulting the other shareholders, Biren executed a one-year written contract with PHSS.

In time, PHSS's performance suffered, in part due to disagreements with Equality regarding documentation and insurance billing coding. Equality soon suffered cash flow problems and in November 1998 it dismissed PHSS as its billing company.

On November 20, 1998, a majority of Equality directors and shareholders voted to remove Biren as an officer and director and to redeem her shares for contracting with PHSS without prior shareholder approval, among other things. The directors relied upon paragraph 3.06 of the Agreement regarding the necessity for shareholder consent to billing contracts and paragraph 2.09 regarding a shareholder's material breach of the Agreement.

Biren demanded that Equality purchase her corporate shares at fair market value. Equality refused and offered to redeem the shares at book value as described in paragraph 2.09 of the Agreement.

Biren then brought an action against Equality and its shareholders for breach of fiduciary duty, breach of contract, and declaratory relief, among

other causes of action. Equality cross-complained for damages for breach of contract, breach of fiduciary duty, negligence and declaratory relief. A court trial followed after Biren rejected Equality's offer to compromise.

At trial, Equality's expert witness Daryl Favale opined that PHSS's billing inefficiencies caused Equality more than $2 million in lost profits. Billing deficiencies included undercoding patient services and lack of collection efforts. Favale could not allocate the portion of the $2 million loss that resulted from undercoding services. When the court asked Favale what portion of the $2 million loss was caused by PHSS undercoding, he said he lacked the ability to answer that question.

Biren also did not pay contributions to Equality's pension plan when due. As a result, Equality paid interest and late fees totaling $11,679.65. Accounting expert Barbara Roller testified that Biren received 21 months' notice of the amount of contributions due. She opined that Biren could have divided the amount by 21 and then saved enough cash each month to meet the obligation.

### Findings and Judgment

The trial court found that Biren materially breached the Agreement by not obtaining prior shareholder approval for dismissing Gottlieb and contracting with PHSS. It found Biren negligent for not paying pension plan contributions timely, causing $11,679.65 in damages. The trial court valued Biren's shares at $46,895.31 according to the formula in the Agreement and the testimony of accounting expert Roller. It found the 90-day period to purchase and redeem Biren's shares began on November 20, 1998, the day a majority of shareholders voted to remove Biren as director and officer and to redeem her shares.

The trial court also decided that Biren did not breach her fiduciary duty to Equality. In its statement of decision the trial court stated that "[i]n terminating Gottlieb and engaging PHSS, Biren reasonably relied on sources of information believed by her to be reliable." Moreover, the court also found Equality did not establish "which portion if any of the losses were the result of Biren's conduct versus the conduct of PHSS or others . . . ."

### Costs and Attorney's Fees

Paragraph 5.10 of the Agreement provides: "Should any party hereto institute an action to enforce or declare any rights or remedies arising under this Agreement, the prevailing party shall be entitled to collect all costs of such suit, including attorneys' fees."

Equality sought attorney's fees pursuant to paragraph 5.10, sections 998 and 1032, and Civil Code section 1717. The court awarded Equality $42,441.50 for costs incurred following its section 998 offer. It denied Equality attorney's fees and costs incurred prior to the section 998 offer, deciding that "there was no prevailing party and . . . each side should bear its own costs and fees . . . ."

Equality and Biren each appeal.

## DISCUSSION

### I. *Equality's Appeal*

#### *Biren's Breach of the Agreement and the Business Judgment Rule*

 Equality contends the trial court's findings establish that Biren breached the Agreement and her fiduciary duties as a director and officer of Equality. It argues that she violated her fiduciary duties by (1) unilaterally dismissing Gottlieb and contracting with PHSS, and (2) not notifying the Equality shareholders and directors of the PHSS contracts and Gottlieb's performance.

The court's finding that Biren "reasonably relied" on information she believed to be correct was tantamount to a finding she acted in good faith. Biren learned that Gottlieb had stopped billing, which in turn affected Equality's cash flow and payroll. Lopez told Biren that she learned of a "mass exodus" of Gottlieb employees and that Gottlieb would not commit to "catch up" on months of delayed billings. She learned from Weitz that his office was experiencing similar billing problems with Gottlieb. From this evidence, the court could find that Biren reasonably believed Gottlieb could not service the accounts. Moreover, because Weitz advised her that Sing had strong references the court could find that Biren reasonably believed that PHSS could service them.

 " '[A] director is not liable for a mistake in business judgment which is made in good faith and in what he or she believes to be the best interests of the corporation . . . .' " (*Barnes v. State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365, 378 [20 Cal.Rptr.2d 87].) "The business judgment rule sets up a presumption that directors' decisions are made in good faith . . . ." (*Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 715 [57 Cal.Rptr.2d 798], italics omitted.)

 Equality argues that assuming Biren's good faith, the business judgment rule does not protect her because she did not obtain board approval

prior to engaging PHSS. "But the [business judgment] rule . . . protect[s] well-meaning directors who are misinformed, misguided, and honestly mistaken." (*F.D.I.C. v. Castetter* (9th Cir. 1999) 184 F.3d 1040, 1046.) Her breach of the Agreement resulted from her mistaken belief that as a director and officer she had the authority to act on behalf of Equality. She stated to office assistant Lopez that "it was an emergency crisis situation and . . . as CFO . . . it was her fiduciary responsibility to maintain the financial stability of the [business] and make a quick and emergency decision." That Biren violated the Agreement by not obtaining prior board approval for the billing contract did not by itself make the business judgment rule inapplicable. (Cf. *F.D.I.C. v. Benson* (S.D.Tex. 1994) 867 F.Supp. 512, 522 [FDIC alleged that directors allowed officers to make improper loans without obtaining the required board approval. But directors were protected by the business judgment rule unless they knew their acts were illegal or they "knowingly committed acts outside the scope of their authority"]; 3A Fletcher, Cyclopedia of the Law of Private Corporations (2001 supp.) § 1128, pp. 55-56.)

Larger corporations often have formal board committees to recommend the approval of a variety of contracts. But small corporations like Equality conduct much of their official business informally. (See Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2002) ¶¶ 6:174 to 6:181, pp. 6-32.3 to 6-34; Corp. Code, § 300, subd. (e).) "[I]t is well known that corporations which include only a few shareholders do not often act with as much formality as larger companies. This is especially so where the members of the board personally conduct the business of the corporation." (2 Fletcher, Cyclopedia of the Law of Private Corporations (1998) § 394.10, pp. 246-247, fn. omitted.) The practice of allowing officers to approve contracts is so prevalent in some close corporations, for example, that they bind the entity even though the officer should have obtained board approval. (2 Fletcher, *supra*, § 444, pp. 368-369.)

Equality was a small corporation run informally by physicians who themselves worked 12-hour shifts in hospital emergency rooms. The Agreement states Equality was a close corporation, although it did not comply with the requirements to establish a close corporation. It delegated most of the billing responsibility to Biren, who relied upon Equality office personnel. Unlike larger corporations, there were no distinct lines between management levels. Biren was given a large responsibility and Equality did not prove she intentionally usurped her authority. (*F.D.I.C. v. Benson, supra,* 867 F.Supp. at p. 522.) The court could reasonably infer that Biren remained within the protection of the business judgment rule because Equality did not prove her actions were anything more than an honest mistake. (*Lee v. Interinsurance Exchange, supra,* 50 Cal.App.4th at p. 715.)

Citing *F.D.I.C. v. Castetter, supra,* 184 F.3d at page 1046, Equality states the business judgment rule "does not protect a director . . . where there is a conflict of interest, fraud, oppression, or corruption." True, but no such evidence exists here.

Although Biren should have brought the matter to the directors for approval, this does not mean she acted in bad faith. Biren testified the other directors were either unavailable or on vacation. Months earlier, when Gottlieb's vice-president Wilson invited Equality directors to discuss billing problems, only Biren attended. She was the director responsible for billing matters. She believed it was her duty to promptly change billing companies to protect the corporation. The trial court could reasonably infer that she mistakenly believed it was in the best interest of the corporation that she act with alacrity because the other directors could not.

Relying on *Gaillard v. Natomas Co.* (1989) 208 Cal.App.3d 1250 [256 Cal.Rptr. 702], Equality contends the business judgment rule does not protect Biren, as she "abdicated" her corporate responsibilities. In *Gaillard,* directors were not immune where they approved multimillion-dollar "golden parachutes" for executives. The evidence supported an inference that they approved excessive compensation, violated tax laws, and ignored evidence of self-dealing. The court's reference to "abdication" described directors who " ' "close [their] eyes [to the] conduct of the business of the corporation . . . ." ' " (*Id.* at pp. 1263-1264.)

But Biren's eyes were wide open to a financial crisis she tried to resolve. Moreover, she did not receive personal financial benefit by dismissing Gottlieb and contracting with PHSS. There was no evidence of self-dealing, illegality, or abdication. Application of the standards of fairness and good faith required of a fiduciary is a factual question for the trier of fact not subject to independent review. (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 32 [216 Cal.Rptr. 130, 702 P.2d 212].)

*Causation and Damages*

Equality contends that the trial court erred by not awarding it damages in the amount of $2,002,940, based upon the testimony of expert witness Favale. We disagree.

The plaintiff must prove a "causal connection" between the defendant's actions and the damages. (*Postal Instant Press, Inc. v. Sealy* (1996) 43 Cal.App.4th 1704, 1709 [51 Cal.Rptr.2d 365].) Damage awards may not be based upon the testimony of experts who rely on speculation. (*Korsak v.*

*Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1527 [3 Cal.Rptr.2d 833]; *Edwards v. California Sports, Inc.* (1988) 206 Cal.App.3d 1284, 1287 [254 Cal.Rptr. 170].) The trial court decides the credibility of experts. (*Specht v. Keitel* (1961) 190 Cal.App.2d 332, 340 [12 Cal.Rptr. 95].)

Favale opined that PHSS's billing inefficiencies cost Equality more than $2 million in lost profits. These deficiencies included undercoding billing and lack of collection efforts. The court questioned Favale what portion of the $2 million loss was caused by undercoding, but Favale was unable to allocate the portion of damage caused by PHSS's poor collection efforts. The court could reasonably infer Favale's conclusions involved speculation, making the claimed damages uncertain.

The court found Equality had not shown "which portion if any of the losses were the result of Biren's conduct versus the conduct of PHSS or others . . . ." There were disagreements between PHSS and Equality over coding and billing procedures. The trial court could reasonably infer that Favale's inability to describe the damages attributable to PHSS's inefficiencies made him unable to give an opinion on Biren's liability. Equality notes that Biren did not present an expert. But it had the burden of proof and Biren's lack of an expert did not cure the deficiencies in Equality's proof.

### *Equality's Right to Costs and Attorney's Fees as a Prevailing Party*

Equality contends that the trial court erred by denying its preoffer costs and its attorney's fees because it was the prevailing party. We disagree.

A prevailing party is entitled to costs of suit. (§ 1032; *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1197-1198 [57 Cal.Rptr.2d 227].) A prevailing party may recover attorney's fees if the litigation involves a contract with an attorney's fees provision. (Civ. Code, § 1717; *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341-1342 [5 Cal.Rptr.2d 154].) Where each side seeks monetary relief, the side that receives the "net monetary recovery" is the prevailing party. (*Michell*, at p. 1198.)

The trial court found that the Agreement provides an award of costs and attorney's fees but Equality did not prevail. Equality contends it obtained a partially favorable judgment because it received $11,679.65 on its cross-complaint. But the judgment states that amount "shall be applied as a credit against" the amount Equality owed Biren to redeem her shares. The court decided the value of those shares was $46,895.31. Equality did not prevail because Biren obtained a net recovery of more than $35,000 from Equality.

The court also could have inferred that Equality did not prevail because it obtained only a "mixed" result. (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 875-877 [39 Cal.Rptr.2d 824, 891 P.2d 804].) Equality's cross-complaint alleged Biren breached a contract causing it damages of more than $1 million. It also sued her for breach of fiduciary duties and sought $2 million damages. But it recovered nothing on these claims. Although it obtained an offset, it is Biren's judgment debtor. Equality contends that Biren's share value was not contested. But the judgment states the court "having been called upon to determine the purchase price of Biren's shares in Equality" did so on the basis of the evidence. Moreover, the court reasonably may have inferred that Equality's unsuccessful causes of action unnecessarily expanded the issues and length of this case. Because of this, it impliedly concluded it was not "equitable" to designate it as a prevailing party. (*Id.* at p. 877.)

Equality contends that it obtained the relief it sought on its declaratory relief claim. But the trial court could also consider the huge disparity between the damages Equality sought and the final result. (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 [86 Cal.Rptr.2d 614, 979 P.2d 974].) Equality has not shown error.

### *Equality's Right to Fees Under Section 998*

■ Equality contends that it is entitled to postoffer attorney's fees under section 998 and *Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at pages 1112 through 1113. We agree.

Equality made a section 998 settlement offer to Biren and she did not obtain relief greater than that offer. Under section 998, "a defendant whose settlement offer exceeds the plaintiff's recovery is entitled to postoffer attorney fees" where the parties' contract has an attorney's fee provision. (*Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1112.) Here paragraph 5.10 of the Agreement provides for attorney's fees to the prevailing party in litigation "arising under this Agreement."

As Equality correctly notes, it need not prevail in the action to recover its postoffer attorney's fees. Where "the plaintiff recovers a judgment less than defendant's pretrial offer, the defendant may recover its costs notwithstanding that the plaintiff is the prevailing party." (*Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1112.) Under section 998, Equality "is treated for purposes of postoffer costs as if it were the prevailing party." (*Scott Co.*, at p. 1112.) Those costs include attorney's fees. (*Id.* at pp. 1112-1113.) We remand this matter to the trial court so that it may decide the amount of those fees.

## II. *Biren's Appeal*

### *Biren's Breach of the Agreement*

Biren contends the trial court erroneously found that she materially breached the Agreement. She points out that in practice, the shareholders never consented in writing to a billing company contract and their Agreement did not provide for oral consent. Biren contends that the oral amendment of paragraph 3.06, deleting the requirement of written approval for billing contracts, was invalid because the Agreement requires amendments thereto to be written. She also relies upon the trial judge's remarks that she had "a good argument that she didn't have to follow" the Agreement regarding written consent.

The court found Biren materially breached the Agreement by, among other things, not obtaining prior approval for dismissing Gottlieb and engaging PHSS. Although paragraph 3.06 requires prior written shareholder approval for billing contracts, the shareholders orally amended the provision to allow oral approval.

Biren's argument rests upon assumptions that are not correct. She assumes the shareholders could not orally amend the Agreement because amendments require a writing according to paragraph 5.11. But "the parties may, by their conduct, waive such a provision" where evidence shows that was their intent. (*Frank T. Hickey, Inc. v. Los Angeles Jewish Community Council* (1954) 128 Cal.App.2d 676, 682-683 [276 P.2d 52].) The court found that in the past, the shareholders took oral votes on billing company contracts. The court reasonably could infer that amendment of the written approval requirement showed the shareholders' intent to conform to practice. Biren's acts also show an intent to treat the written approval provision as if it never existed. Because she "behaved in a manner antithetical" to it, she may not now rely on it. (*Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1388 [265 Cal.Rptr. 412].)

Moreover, the trial court found, with sufficient evidentiary support, that Biren's breach was material. It stated that Biren did not give other shareholders an opportunity to discuss or evaluate PHSS. It found that had she let the board decide "it is more likely than not that Equality would not have terminated Gottlieb . . . ." Biren may not rely on the court's earlier remarks because the subsequent judgment and formal findings are controlling. (*Burbank-Glendale-Pasadena-Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 591 [284 Cal.Rptr. 498].)

*Redemption Deadline and Date for Valuation of Biren's Shares*

Biren contends the trial court erred by using November 20, 1998, the date of her removal, as the date for redemption and valuation of her shares. She argues that August 14, 1997, the date of her breach of the agreement, is the proper valuation date. Biren relies upon paragraph 2.09 of the Agreement, providing: "[U]pon the occurrence of any of the events set forth below . . . the Corporation shall purchase and such Shareholder . . . shall sell to Corporation . . . all of the Shares . . . then held by said Shareholder . . . ." Under the heading "Events Causing Transfer of Shares" one event is "[a] Shareholder materially breaches a term or condition of this Agreement and fails to cure said breach." The purchase and sale "shall be completed no later than ninety (90) days following the date on which the event occurred."

Biren claims that because the earlier date is the proper date, three consequences follow: (1) Equality lost its right to redeem her shares because 90 days passed, (2) it waived its right to redeem because a 15-month delay is unreasonable, and (3) it erroneously calculated her share value by deducting expenses which occurred up to November 20, 1998. We conclude her arguments fail because the August 14, 1997, date did not apply.

The goal of contractual interpretation is to find " 'the mutual intention of the parties.' " (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].) The words used in the Agreement and evidence about the parties' conduct are guides to what they reasonably intended. (*Ibid.*) Biren contends that because the court found she breached the Agreement on August 14, that is the "event causing transfer of shares." But, as Equality correctly notes, the agreement also allows the shareholder to "cure" the breach. The unambiguous language shows that the term "event" encompasses more than a breach.

Equality gave Biren 15 months to cure the breach, partly due to her assurances that PHSS would improve its performance. Because this benefited Biren, it would be unreasonable to exclude the time to cure the breach from the meaning of "event." The trial court therefore correctly ruled that the 90-day redemption provision began on November 20, 1998.

*Including 1999 Expenses to Reduce Biren's Share Value*

Biren contends the court incorrectly calculated the value of her shares. We disagree. The court found that value to be $46,895.31 based on the formula in the Agreement. That formula requires multiplying Biren's

share interest percentage "by the aggregate value of the following items as of the date on which the transfer causing event occurs: [¶] (i) The cash balance in any and all accounts of the Corporation less any and all outstanding liabilities of the Corporation . . . ."

Biren argues that the court erred by including Equality's city business tax liabilities that were due in 1999, well after the November 20, 1998, valuation date. But Roller, Equality's accounting expert, testified that the tax liabilities are calculated on the prior year's income. She stated that because "this was money that was owed because of earnings in 1998 [she] accrued it through November 20th, 1998." The trial court expressly found Roller's calculations to be accurate. Biren presented no expert testimony to support her position or to contradict Roller. The tax liability was a debt for 1998 earnings. Cities may bill for taxes in a later year, but the debt was incurred and thus an "outstanding liabilit[y]" within the valuation method of paragraph 2.09 of the Agreement.

### Negligence Regarding Pension Contributions

Biren contends there is insufficient evidence that she was negligent for failing to pay pension plan contributions timely. She points out that Equality had insufficient funds in its bank account to pay the contributions and that the other shareholders were aware of Equality's cash flow problems.

In reviewing the sufficiency of evidence to support a judgment, we view the evidence and draw all reasonable inferences therefrom in support of the judgment. *(Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203 [52 Cal.Rptr.2d 518].) Credibility of witnesses and weight of the evidence are matters for the trier of fact. (*Id.* at pp. 1203-1204.) We do not substitute our views for those of the trial court. (*Id.* at p. 1204.)

Here Biren was the chief financial officer and timely pension plan contributions were essential for the employees' retirement. Corporate financial officers must give pension payments the highest priority, and severe penalties exist for not doing so. (*Cairy v. Superior Court* (1987) 192 Cal.App.3d 840, 845 [237 Cal.Rptr. 715]; *Winterrowd v. David Freedman and Co., Inc.* (9th Cir. 1984) 724 F.2d 823, 826; *Dunlop v. Tremayne* (1965) 62 Cal.2d 427, 431 [42 Cal.Rptr. 438, 398 P.2d 774, 17 A.L.R.3d 368].)

Biren argues that a check for the contributions "never cleared the bank." But it was her responsibility to ensure there were funds available when the obligation became due. Equality was collecting more than $300,000 a

month. Roller testified that Biren had 21 months' notice of the amount of contributions due. She opined that Biren could have divided the total by 21 and then saved enough each month to meet the obligation. From this testimony, the trial court reasonably could infer Biren was negligent for not doing that.

The order denying Equality attorney's fees under section 998 is reversed and the matter remanded. In all other respects the judgment and order are affirmed. Costs on appeal to Equality.

Coffee, J., and Perren, J., concurred.